## JACKSON D. PENNINGTON *v.* STATE OF MARYLAND

[No. 251, September Term, 1973.]

*Decided October 26, 1973.*

---

254

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*Sheldon H. Braiterman* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Robert C. Stewart* and *Thomas Bollinger, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

Officer Wiley Owens of the Baltimore City Police Department little knew on 16 August 1969 when he arrested Hershell Brooks Owens about 1:30 A.M. for violations of the traffic laws, which the Officer described as "operating [a vehicle] under the influence of alcohol, reckless driving and failure to identify himself after an accident," [1] that a series of events was triggered which resulted in JACKSON D. PENNINGTON, a member of the Bar of Maryland, being convicted on 11 December 1972 at a bench trial in the Criminal Court of Baltimore, of the crimes of subornation of perjury, obstruction of justice, and bribery, and being sentenced to 6 months on each conviction, the sentences to run concurrently.[2]

What happened after the arrest of H. B. Owens was brought out at Pennington's trial. The State's case was submitted on an agreed statement of facts:

---

[1] The precise offenses charged cannot be ascertained from the record before us. See Code, Art. 66½, §§ 10-104, 10-105, 11-901, 11-902. With respect to the arrest, see Code, Art. 66½, § 16-105.

[2] It appears that on 13 November 1969 indictments 7962, 7963, 7964, 7965, 7966 and 7967 were filed against Pennington. 7962 charged conspiracy to violate the bribery laws; 7963 charged subornation of perjury; 7965 charged obstruction of justice; 7966 charged bribery. The nature of the charges presented by 7964 and 7967 is not shown in the record before us. The State called 7962, 7963, 7965, and 7966 for trial. Pennington was found not guilty under 7962 and guilty under 7963, 7965 and 7966. A *nolle prosequi* as to each of 7964 and 7967 was entered in open court.

"MR. BOLLINGER [Assistant State's Attorney]: If Your Honor please, the statement of facts in this case would be as follows: The State would call as a witness Hershell B. Owens, 418 Hornell Street in Baltimore, 21224. Mr. Owens would testify that at approximately 1:30 A.M. on Saturday, 16 August 1969, he was stopped at Pratt and Scott Streets in Baltimore, Maryland by Officer Wiley Owens of the Baltimore City Police Department. Now, Officer Owens, Hershell Owens would testify, is no relation to him. He was charged by Officer Owens with operating under the influence of alcohol, reckless driving and failure to identify himself after an accident, and he was taken to Central District lock up.

On the morning of 17 August 1969 he would testify he retained the Defendant, Jackson D. Pennington, as his attorney, and he would identify Mr. Pennington before Your Honor as the attorney he retained. He would state that Mr. Pennington arranged for his bond and that he was released. Thereafter the traffic case was postponed on several occasions, and Pennington, Defendant Pennington had asked for $300.00 for his services to represent him. This is basically the reason for so many postponements. Mr. Owens would testify he was having difficulties making payments. $200.00 of the money he would testify was eventually paid by his mother.

On October 27th, 1969, Mr. Owens would testify, he was finally arrested on a bench warrant issued by the Honorable Judge Mary Arabian for failing to appear for trial. On 10 November, 1969 Mr. Owens appeared before the Honorable Harold Lewis in the Traffic Division of Municipal Court. He was represented by the Defendant, Attorney Pennington, testimony was taken from Officer Wiley Owens and Hershell B. Owens was found guilty of all three charges and was assessed $275.00

in fines. The witness would also state, if Your Honor please, that these fines were eventually paid by Mr. Pennington, the Defendant.

Mr. Owens would further testify that he believed from his conversations with his attorney, Pennington, that the charges of operating under the influence and leaving the scene of an accident would be dismissed and he would probably be found guilty of the lesser offense of reckless operation.

Hershell Owens would further relate his conversations with Attorney Pennington between August 16th, 1969 and November the 10th, 1969 relating to the arrangements and preparation of his case.

Now, Mrs. Mamie Anne Newby — N E W B Y — of 418 Hornell Street, Baltimore, Maryland, would testify she is the mother of Hershell B. Owens and between 16 August 1969 and 10 November 1969 she had several conversations with her son's attorney, whom she would identify as the defendant, Jackson D. Pennington, and she paid him $200.00 of the $300.00 fee demanded by Mr. Pennington.

The State would also call Clarence D. Vipperman — V I P P E R M A N — who lives at 1402-J Browning Drive, Baltimore 21221. He would testify that he is known by the nickname of Chuck and that during the month of December of 1968, while a member of the Baltimore City Police Department at that time, he became acquainted with the Defendant, Jackson Pennington. Between then and October of 1969 Pennington represented Mr. Vipperman in several civil matters, but he did not charge Vipperman a fee for his services.

Mr. Vipperman would further testify that sometime during September or Early October of 1969 Mr. Vipperman had a telephone conversation with Defendant Pennington, during which Mr. Pennington asked if he, that is Vipperman, knew an Officer Owens of the Tactical Squad of the

258

Baltimore City Police Department. Mr. Vipperman said 'no'. Mr. Pennington asked if he knew anybody in Tactical, and Mr. Vipperman said he knew an individual by the name of Chip, who is Officer Vernon R. Steffe. The Defendant Pennington asked Mr. Vipperman to contact Steffe and to ask Steffe to get in touch with Officer Owens on Pennington's behalf. Mr. Vipperman did contact Officer Steffe who agreed to contact Officer Wiley Owens. A short time later Pennington told Vipperman that Steffe had come to Pennington's law office and picked up $200.00 in connection with the Owens case.

Now, this, we would add to the statement of facts, Your Honor, would be denied by the Defendant, this latter part, that he had met with or that he told Vipperman there had been a meeting at his office at which $200.00 was picked up.

\* \* \*

It would also be part of the testimony of Clarence D. Vipperman, Your Honor, that this particular witness would testify he was separated from the Police Department as a result of his connection with the Defendant Pennington in this case, and that he, himself, was never charged with this particular crime or any connection with this crime.

The State would then show through the testimony of Vernon R. Steffe — S T E F F E — of 518 Wickham Road in Baltimore, 21229 — Mr. Steffe is here in Court, for the record. Would you stand up, please, Mr. Steffe? Thank you. Mr. Steffe would testify that his nickname is Chip and that during September or early October, 1969, while he was a member of the Baltimore City Police Department, he was contacted by an officer known to him as Chuck, who is Clarence Vipperman, of Southeast District, and Mr. Vipperman asked him if he knew Officer Owens in Tactical. Steffe replied affirmatively. Vipperman said that the Attorney Pennington would get in touch with him. During

the last part of October Pennington called Steffe at home and asked him to see if Officer Owens had anything personal against Hershell B. Owens; if not, Steffe was to suggest that perhaps Officer Owens could take it a little easy on Hershell Owens in court and it might be worth some money. Thereafter, at approximately 5:00 P.M. on October 31, 1969 Steffe met Officer Owens on the Tactical parking lot at a shift change. Officer Owens indicated that he had nothing personal against Hershell Owens and that his only interest was in getting the case to trial because it had been postponed so often. Later, on November the 3rd, 1969, Steffe informed Pennington that he had seen Officer Owens, and Pennington instructed him to come to his office on Lexington Street, and Pennington gave Steffe two $50.00 bills along with detailed instructions as to what Officer Owens was to do in court on the drunk driving case in order to justify the bribe money. Pennington also gave Mr. Steffe two additional $50.00 bills for Steffe's part in contacting Owens and being the intermediary in the scheme.

After getting the money about 7:00 P.M., Mr. Steffe on November the 3rd, 1969 called Officer Owens at his home and said he wanted to come over. Steffe, accompanied by his wife, drove to Officer Owens' house, arriving around 7:30, and he was admitted without his wife. He went into the officer's house by himself. He was admitted to the officer's house by a fellow officer, Officer Bobby Williams. Steffe related that Pennington said that Officer Owens was to withhold evidence. Steffe then placed the two $50.00 bills which Pennington had given him on the coffee table and left.

The next witness the State would call would be Thelma J. Owens of 1913 E. 30th Street in Baltimore. Mrs. Owens would testify that she is the wife of Officer Wiley Owens; that approximately at

260

6:45 P.M. on the night of November the 3rd, 1969 she answered her home phone; that the caller identified himself as Chip and asked to speak to her husband, Officer Wiley Owens. She said that her husband had stepped out, but would be back shortly. A few minutes later the phone rang again and Officer Owens answered it. She heard her husband say, 'There may be $100.00 in it for me.' After her husband had concluded the conversation, she overheard him call his superior officer, Sergeant Regus Raffensberger and relate the previous conversation to him. About 15 minutes later she would testify Officer Steffe arrived at the house. Officer Bobby Williams of the Tactical Squad was a guest in the Owens' house, and he answered the door and admitted Steffe. She returned from the kitchen and observed her husband and Officer Steffe converse and heard Steffe say 'It is close to Christmas time.' With that, Steffe bent over the coffee table, placed something on it and when he straightened up she saw two $50.00 bills which had not been there before, and she wrote down the serial numbers of the bills after Steffe had left.

Now, the State would then call Officer Bobby Williams of the Tactical Section of the Baltimore City Police Department at that time, and he would testify that at approximately 7:30 P.M. on 3 November, 1969, he was a guest in the home of Officer and Mrs. Wiley Owens located at 1913 E. 30th Street. He admitted Officer Vernon Steffe to the premises and was present during the conversation between Officer Steffe and Officer Owens in the living room, during which Officer Steffe related he was acting on behalf of Attorney Pennington in the Hershell Owens drunk driving case. Steffe said that Pennington wanted Officer Owens to withhold essential evidence when he testified in court, and he indicated that Officer Owens would not be challenged for the omissions.

At the end of the conversation, Officer Williams heard Steffe mention that it was near Christmas time. He observed Steffe remove two $50.00 bills from his jacket and place them on the coffee table just before leaving.

Officer Williams was present minutes later when Sergeant Raffensberger arrived with Officer Lansey, and he observed Officer Smith of the Crime Laboratory photograph the money on the table, after which Officer Lansey recovered the money.

The State would call Sergeant Regus Raffensberger of the Tactical Section of the Baltimore City Police Department, and he would testify at approximately 7:00 P.M., on 3 November 1969, while he was on duty as Officer In Charge, he received a call from Officer Wiley Owens, reporting the substance of the telephone conversation which Owens had just received from Officer Vernon Steffe. Officer Owens advised Sergeant Raffensberger that Steffe was on his way to Owens' home with $100.00 to give him in regard to a drunk driving case. Sergeant Raffensberger immediately notified Officer John Lansey of the Internal Investigation Division of the Baltimore City Police Department and arrangements were made to meet at the Owens' home. At approximately 7:30 P.M. Sergeant Raffensberger called upon Officer Owens only to find out that Steffe had already arrived and the transaction was being viewed by Officer Bobby Williams. At approximately 7:50 P.M. Sergeant Raffensberger, and Sergeant Francis Gutierrez met Officer Lansey and the three proceeded to the Owens' home. There they recovered the two $50.00 bills from the coffee table where Steffe had placed them. Officer Robert Smith of the Crime Laboratory responded and photographed the bills in Sergeant Raffensberger's presence, after which Officer Lansey took custody of them. [The photographs were received in evidence]

\* \* \*

The State would call, if Your Honor please, Officer Wiley Owens of the Baltimore City Police Department. For the record, Officer Owens is in the courtroom. Would you stand up, please? Thank you. Now, Officer Owens, if Your Honor please, would testify he lives at 1913 E. 30th Street, and that he had arrested an individual by the name of Hershell B. Owens, no relation, at approximately 1:30 A.M. on August the 16th, 1969 for three traffic violations. If Your Honor please, we would offer as State's Exhibit 2 the Summons, Book No. G 2834-29, which was issued by Officer Wiley Owens to Hershell Brooks Owens. [The summons was received in evidence]

\* \* \*

Officer Wiley Owens would further testify that the case was postponed in the Traffic Division of Municipal Court on several occasions, and on the 27th of October, 1969, the Honorable Mary Arabian issued a Bench Warrant for Hershell Owens' arrest for failure to appear. Officer Owens executed the warrant and Hershell Owens was remanded to City Jail to await trial which was scheduled for 10 November 1969.

He would further testify at approximately 6:45 P.M. on Tuesday, 31 October 1969, Officer Owens was approached by Officer Vernon Steffe on the Tactical Division parking lot. Steffe advised Officer Owens that he was a friend of Hershell Owens' family and he inquired whether Officer Owens had anything personal against Hershell Owens. Officer Owens replied that he did not, but he was anxious to dispose of the case because of the numerous postponements. Steffe then indicated he would contact Officer Owens later after talking to Attorney Pennington in order to determine how best to handle the matter. At approximately 7:00 P.M. on Monday, 3 November, 1969, Officer Owens

would testify he received a telephone call at his home from Officer Steffe, who related that he had discussed the matter with Pennington and had been authorized to pay Officer Owens $100.00 in return for withholding evidence at Hershell Owens' trial. Steffe concluded by saying that he would stop by Officer Owens' house shortly to complete the arrangements. Immediately thereafter Officer Owens notified Sergeant Raffensberger of the telephone conversation with Steffe. At approximately 7:30 P.M. on 3 November, 1969, Officer Steffe arrived at Officer Owens' home. In the presence of Officer Bobby Williams, Steffe related that he had talked to Pennington who wanted Officer Owens to withhold essential evidence in the drunk driving case. Pennington further stated that he would make an arrangement in the case. Steffe then removed two $50.00 bills and placed them on the coffee table in front of Officer Owens, remarking that it was near Christmas time and he knew that Owens could use the money. Minutes later, within minutes after Steffe left, Sergeant Raffensberger and Officer Lansey arrived at the Owens' home, the money was photographed by Officer Smith of the Crime Laboratory and was then recovered by Officer Lansey.

The next morning, 4 November, 1969, Officer Owens in company with Officer Bobby Williams, Sergeant James Colvin, Sergeant Raffensberger, Officer Edwin Carter and Officer John Lansey reported the incident to the State's Attorney's Office to Assistant State's Attorney Robert Stewart. Between 9:10 A.M. and 11:02 A.M. on 10 November, 1969, Officer Owens conversed with Attorney Pennington outside of the courtroom of the traffic court. Officer Owens first described to Pennington the circumstances surrounding the arrest of Hershell Owens. Pennington then

instructed Officer Owens on what his testimony should be, directing him to withhold certain words, facts and physical evidence in order to weaken the State's case. Pennington admitted that he had seen Officer Steffe on Saturday and that he arranged for Steffe to give the money to Officer Owens. Pennington further instructed Owens to tell the Judge that he had misplaced his folder which contained the description of Hershell Owens' behavior and appearance at the time of arrest, and Pennington gave detailed instructions on what Officer Owens was to say and omit. Officer Owens then entered the courtroom. He would testify he spoke briefly with Hershell Owens and then the case was called for trial. Officer Owens under the observation of Officers Bobby Williams and Edwin Carter testified truthfully about the case, and Pennington argued for his client, after which Judge Lewis found Hershell Owens guilty of all three charges.

\* \* \*

The State would then call, if Your Honor please, the Honorable Harold Lewis, who is presently a Judge of the District Court of Baltimore City, and in November of 1969 was sitting as a Judge on the Municipal Court of Baltimore City in the Traffic Section, and he would testify about the events of the trial between the State and Hershell B. Owens before him on the morning of November the 10th, 1969, stating that he tried the case of Hershell Owens and found the defendant guilty based on the evidence before him.

That, if Your Honor please, would be the State's case in chief."

At the insistence of defense counsel the statement was supplemented to include that Steffe would further testify that he was no longer with the Baltimore City Police Department and that although there had been no previous

disposition of the cases against him, the State had promised him "in return for his truthful testimony in this regard that he would not be prosecuted, although he was indicted." Defense counsel also requested that the statement include that H. B. Owens appealed from the judgments entered against him in the Municipal Court. The appeal came up after Pennington had been indicted, and the State "*nol prossed* the case." The State objected to including the fact of "the *nol pros* . . . of the *de novo* case on appeal . . . as being irrelevant to the case before Your Honor." The trial court overruled the objection.

On direct appeal from the judgments entered against him, Pennington contends that the trial court erred:

I in denying motions to dismiss the indictments, and

II in failing to consider his contentions of prosecutorial misconduct.

I

## THE MOTIONS TO DISMISS THE INDICTMENTS

On 16 March 1972 Pennington filed a motion to dismiss the indictments, grounded on the interception and recording of oral communications. There was a hearing on the motion before Liss, J. on 27 March 1972. The decision was held *sub curia*. On 13 October 1972 the motion was denied. When the case came on for trial before Sodaro, J., Pennington renewed his motion to dismiss. Upon consideration of memoranda submitted and argument of counsel, the motion was denied by the trial judge.

(1)

*The Use of Electronic Devices*

What the evidence presented at the trial by the agreed statement of facts did not reflect was that on the morning of 10 November 1969, when the case against H. B. Owens was scheduled for trial in the Traffic Court, Officer Owens was

"wired". An electronic transmitter and receiver and recording system were concealed on his person. Conversations between him and other persons had before, during and after the trial, covering a period commencing 9:10 A.M. and terminating 11:02 A.M., were recorded by means of these electronic devices.[3]

*The Constitutional Question*

Generally, a constitutional right is involved in the interception of wire and oral communications. Conversation is within the ambit of fourth amendment protection and the use of electronic, mechanical or other devices to capture it is a "search" within the meaning of that amendment. *Berger v. New York*, 388 U. S. 41, 51. See *Katz v. United States*, 389 U. S. 347; *Osborn v. United States*, 385 U. S. 323. We do not believe, however, that in the circumstances here, the use of the electronic devices was an unreasonable search in the constitutional sense. In *Lopez v. United States*, 373 U. S. 427, Davis, an internal revenue agent, entered Lopez's office with Lopez's consent and by use of a concealed electronic device, carried in and taken out by him, recorded their conversation. The Court was not long detained by the claim that Davis should not be permitted to testify about the conversation,

---

**3.** One tape was obtained, which, according to an inventory returned to the court, contained:

(1) approximately 13 minutes of conversation outside the courtroom, between Officer Owens and Pennington "during which the latter made a number of incriminatory statements directing Officer Owens what to say before the court in testifying against Defendant Hershell Owens."

(2) approximately 6 minutes of conversation, inside the courtroom, between Officer Owens and H. B. Owens "the contents of which are unequivocal as to Defendant Owens participation in the above-described conspiracy."

(3) approximately 20 minutes of conversation, inside the courtroom, between Officer Owens and H. B. Owens and between Pennington and the trial judge, none of which was inculpatory.

(4) a brief comment outside the courtroom by Pennington that the conviction would be appealed.

The inventory declared that the balance of the material contained in the tape consisted of "fragments of conversations which took place around Officer Owens inside and outside the courtroom involving various persons who happened to be in the building. Most of these are not clear."

finding that Davis was not guilty of an unlawful invasion of Lopez's office simply because his apparent willingness to accept a bribe was not real. The Court said, at 438: "The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. We decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is a constitutionally protected communication." The Court then considered the constitutional claim that the fourth amendment constitutional rights of Lopez were violated by the recording of the conversation, noting that the claim emerged in its proper perspective once it was plain that Davis could properly testify about his conversation. We think the language of the Court significant.

> "Indeed this case involves no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself. * * * Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a

bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." At 439.

In reaching the conclusion that the evidence was properly admissible, the Court, at 438, referred to *On Lee v. United States*, 343 U. S. 747. The Court observed, at 440:

"When we look for the overriding considerations that might require the exclusion of the highly useful evidence involved here, we find nothing. There has been no invasion of constitutionally protected rights, and no violation of federal law or rules of procedure. Indeed, there has not even been any electronic eavesdropping on a private conversation which government agents could not otherwise have overheard. There has, in short, been no act of any kind which could justify the creation of an exclusionary rule."

We reject any suggestion that *On Lee* and *Lopez* are no longer viable in light of *Katz v. United States, supra*. We are in complete accord with the opinion announcing the judgment of the Court in *United States v. White*, 401 U. S. 745, decided 5 April 1971.[4] The opinion noted that *Katz* finally swept away the physical trespass doctrines, overruling *Olmstead v. United States*, 277 U. S. 438, and *Goldman v. United States*, 316 U. S. 129.[5] And to the extent

---

4. Mr. Justice White announced the judgment of the Court in an opinion in which the Chief Justice, Mr. Justice Stewart, and Mr. Justice Blackmun joined. Mr. Justice Black concurred in the judgment for the reasons set out in his dissent in *Katz*. Mr. Justice Brennan concurred in the result. Mr. Justice Douglas, Mr. Justice Marshall and Mr. Justice Harlan dissented. Thus there was no opinion representing a majority of the Court, but we are persuaded that the opinion of Mr. Justice White reflects the proper status of the law. We follow it. The opinion of Mr. Justice White is hereinafter referred to as "the opinion."

5. Until *Katz*, neither wiretapping nor electronic eavesdropping violated a defendant's fourth amendment rights "unless there has been an official search and seizure of his person, or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure." 401 U. S. at 748, citing *Olmstead* at 466 and *Goldman* at 135-136.

that *On Lee* rejected claims of a fourth amendment violation because the informer had not trespassed when he entered the defendant's premises, it cannot survive *Katz*. But, said the opinion in *White*, at 750, the Court in *On Lee* "announced a second and independent ground for its decision; for it went on to say that overruling *Olmstead* and *Goldman* would be of no aid to On Lee since he 'was talking confidentially and indiscreetly with one he trusted, and he was overheard. * * * It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here.' 343 U. S. at 753-754, 72 S. Ct. at 972. We see no indication in *Katz* that the Court meant to disturb that understanding of the Fourth Amendment or to disturb the result reached in the *On Lee* case, nor are we now inclined to overturn this view of the Fourth Amendment." We think the comments which follow at 751-753 in the opinion are so apropos to the question before us as to warrant setting them out verbatim:

> "Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. Hoffa v. United States, 385 U. S. [293] at 300-303, 87 S. Ct., at 412-414. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, Lopez v. United States, *supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located

elsewhere or to other agents monitoring the transmitting frequency. On Lee v. United States, *supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. Very probably, individual defendants neither know nor suspect that their colleagues have gone or will go to the police or are carrying recorders or transmitters. Otherwise, conversation would cease and our problem with these encounters would be nonexistent or far different from those now before us. Our problem in terms of the principles announced in *Katz,* is what expectations of privacy are constitutionally 'justifiable' — what expectations the Fourth Amendment will protect in the absence of a warrant. So far; the law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police, as well as by authorizing the use of informants in the manner exemplified by *Hoffa* and *Lewis.* [*v. United States,* 385 U. S. 206] If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. See Lopez v. United States, 373 U. S. 427, 83 S. Ct. 1381, 10 L.Ed.2d 462 (1963).

Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. Given the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound. At least there is no persuasive evidence that the difference in this respect between the electronically equipped and the unequipped agent is substantial enough to require discrete constitutional recognition, particularly under the Fourth Amendment which is ruled by fluid concepts of 'reasonableness'."

The opinion, at 753, set out another rationale for the conclusion reached:

"Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do

not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question."

The opinion pointed out that its conclusion was the result reached by prior cases of the Court, citing *On Lee* and *Lopez*. It thus affirmed that *On Lee* and *Lopez*, with respect to the point at issue, are to be regarded as sound law.[6]

We hold that the use of the electronic devices in the circumstances of the instant case did not violate the fourth amendment guarantee against unreasonable searches and seizures.[7]

*The Statutory Question*

Having determined that the fourth amendment guarantee

---

6. Mr. Justice Douglas in his dissent thought that "the discredited decisions in *On Lee* and *Lopez* are resuscitated and revived . . . ." 401 U. S. at 764.

7. We concluded in *State v. Siegel*, 13 Md. App. 444, 452-453, that only under the fourth amendment is the validity of interception of communications to be tested. We said:

"In considering the constitutionality of the federal act we first note that only Fourth Amendment guarantees are involved. Significantly the Supreme Court did not place any reliance either in *Berger* [v. New York, 388 U. S. 41] or *Katz* on rights flowing from any of the other amendments. We do not feel that fear of surveillance of communications when that surveillance is circumscribed under Fourth Amendment standards amounts to a denial of free speech under the First Amendment. Nor do we think that it violates Fifth Amendment provisions because it seizes incriminating testimonial statements. In the absence of compulsion by the authorities such seizure does not bring the right against self-incrimination into play. See *Hoffa v. United States*, 385 U. S. 293; *Todisco v. United States*, 298 F. 2d 208 (9th Cir. 1961), *cert. denied*, 368 U. S. 989 (1962). And it seems that only in certain circumstances, as when a person has been taken into custody or otherwise deprived of his freedom by the authorities, would the Sixth Amendment right to assistance of counsel in any event preclude an electronic surveillance. Usually there would be no custodial interrogation to invoke dictates of *Miranda v. Arizona*, 384 U. S. 436. And with respect to privileged communications between attorney and client, § 2517 (4) of the act provides: 'No otherwise privileged wire or oral communication intercepted in accordance with or in violation of, the provisions of this chapter shall lose its privileged character'."

against unreasonable searches and seizures was not violated here by the use of the electronic devices, we look to see if there was a statutory bar to their use.

In Maryland, the interception of wire communications and oral communications is substantially controlled by an act of the Congress of the United States, Pub. L. 90-351, Title III, § 802, June 19, 1968, 82 Stat. 212, ch. 119, codified as 18 U.S.C. §§ 2510-2520 (the federal act). We held in *State v. Siegel*, 13 Md. App. 444, *aff'd*, 266 Md. 256, that although the federal act is not self-executing as far as the states are concerned, it is applicable to this State through Maryland Code, Art. 35, §§ 92-99, "Wire Tapping", and Art. 27, § 125 A-D, "Electronic Devices." We stated that no such interception may be lawfully made except on an order authorizing it first obtained, and that the entering of such orders and all matters with regard to the execution of them, and the use and disposition of evidence and property seized under them, shall be in conformity with the provisions of the federal act. We found that a judge of the Supreme Bench of Baltimore City, presiding in the Criminal Court of Baltimore, and a judge of a Circuit Court of a county of this State may enter orders authorizing such interceptions, that such orders may be entered only when the interception of wire or oral communications may provide evidence of the commission of the offenses of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, or any conspiracy to commit any of those offenses, that application for such orders with respect to wiretapping may be made by the Attorney General or a State's Attorney, and that application for such orders with respect to electronic devices may be made only by a State's Attorney. We observed that the State *may* require procedures that are more restrictive than those spelled out in the federal act. 13 Md. App. at 460. This is the present status of the law of Maryland concerning the interception of wire and oral communications.[8]

---

8. H.B. 962, relating to the use of wiretaps, enacted during the 1973 session of the General Assembly, was vetoed.

274

### The Federal Act

The federal act expressly exempts consensual and participant monitoring by law enforcement agents from the general prohibitions against surveillance without prior judicial authorization and permits the fruits to be received as evidence. Section 2511 (2) (c) prescribes:

> "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

Section 2515 prohibits the receipt of intercepted communications in evidence "in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof" only "if the disclosure of that information would be in violation of this chapter." Thus, the communications here could properly be received in evidence because there was no prohibited use of electronic devices involved, the utilization as here of such devices being within the exemption spelled out in § 2511 (2) (c).[9]

We observe that in *White* both the plurality opinion and the dissenting opinion of Justice Harlan accepted that the federal act did not make unlawful consensual and

---

**9.** The provisions of § 2511 (2) (c) are in accord with the findings of the Congress based on its own investigations and published studies. Pub. L. 90-351, § 801. "Electronic, mechanical, and other intercepting devices are being used to overhear oral conversations made in private, *without the consent of any of the parties to such communications.*" (emphasis added). § 801 (a). "Organized criminals make extensive use of wire and oral communications in their criminal activities. The interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice." § 801 (c). The sanctity of the right to privacy, however, must be zealously guarded. "To safeguard the privacy of innocent persons, the interception of wire or oral communications *where none of the parties to the communication has consented to the interception* should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court." (emphasis added). § 801 (d).

participant monitoring by law enforcement agents. The plurality opinion, observing that it is ". . . untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a 'reasonable' investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an 'unreasonable' and unconstitutional search and seizure," pointed out, at 753:

> "Our opinion is currently shared by Congress and the Executive Branch, Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 212, 18 U.S.C. § 2510 et seq. (1964 ed., Supp. V), and the American Bar Association. Project on Standards for Criminal Justice, Electronic Surveillance § 4.1 (Approved Draft 1971)."

Mr. Justice Harlan in his dissenting opinion reached the conclusion that "it must be held that third-party electronic monitoring, subject only to the self-restraint of law enforcement officials, has no place in our society", notwithstanding seemingly contrary views of Congress, pointing out that "2511 (2) (c) exempts consensual and participant monitoring by law enforcement agents from the general prohibitions against surveillance without prior judicial authorization and makes the fruits admissible in court * * *." 401 U. S. at 790-791.[10]

We hold that the use of electronic devices in the circumstances of the instant case was not unlawful under the federal act.

### The State Statute

Acts 1959, ch. 706, codified as Code, Art. 27, §§ 125A-

---

10. Mr. Justice Harlan noted the congressional *malaise* with such conduct as "evidenced by the contrastingly limited endorsement of consensual surveillance carried out by private individuals." 401 U. S. at 791. See § 2511 (2) (d), which prohibits non-governmental recording and listening when the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

125D concerns "Electronic Devices." Section 125A (a) makes it unlawful "for any person in this State to use any electronic device or other device or equipment of any type whatsoever in such manner as to overhear or record any part of the conversation or words spoken to or by any person in private conversation without the knowledge or consent, expressed or implied, by that other person."[11] We discuss this statute in the light of the factual posture of the case before us.

The use of electronic devices by Officer Owens was under the authority of an order entered on 9 November 1969 by a judge of the Supreme Bench of Baltimore City on written application upon oath by the State's Attorney for Baltimore City. The application purported to be pursuant to "Article 27, Section 125A, or Article 35, Sections 92-95, of the Maryland Annotated Code and the Federal Omnibus Crime Control and Safe Streets Act of 1968." The basis of Pennington's complaint is that the contents of the conversation between him and the officer, placed in evidence before the Grand Jury which returned the true bills against him, had been recorded by means of an electronic device, a fact made known to the jurors.[12] He alleges that this evidence should have been excluded because, for divers reasons he advances, the application for the authorizing order was illegal.

We have found that the recording of the communications

---

11. Section 125A (b) and (c) provides for application for and judicial issuance of an ex parte order authorizing the use of electronic devices. Section 125B prescribes the penalty for violation of the statute. Section 125C declares that the subtitle shall not be construed so as to prevail over the wiretapping provisions of Code, Art. 35, §§ 92-99 and the penalty provisions therefore in Code, Art. 27, § 585. Section 125D concerns the registration of eavesdropping and wiretapping devices.

12. In his appearance before the Grand Jury, Officer Owens narrated what had occurred before the morning of H. B. Owens's trial. The Assistant State's Attorney conducting the examination elicited from him that on the morning of the trial a microphone and transmitter had been placed on his person in the office of the State's Attorney. Officer Owens then went to court and talked to Pennington. During his recounting of the contents of the conversation the Foreman of the Grand Jury asked: "Just a minute. When this discussion occurred with Mr. Pennington, the microphone was placed in a recorder?" The Assistant State's Attorney replied: "This is all recorded."

between Officer Owens and Pennington was neither constitutionally proscribed nor prohibited by the federal act. It would be illegal, therefore, only if the State statute made it so. There is no need, however, for us to determine whether Code, Art. 27, § 125A, et seq., is more restrictive than the federal act so as to forbid participant monitoring.[13] Likewise, it is not necessary for us to decide whether the application for the authorizing order was legal.

Even if the State statute prohibits participant monitoring by electronic devices, and even if the order entered here authorizing the interception was illegal, the testimony of Officer Owens was, in any event, properly admissible before the grand jury.[14] We have two bases for this conclusion. First, the State statute is a criminal statute, codified under Art. 27, Titled "Crimes and Punishments", and the statutory sanction, which we declared in *Siegel* to be in full force and effect, 13 Md. App. at 463, is to make the use of electronic devices as proscribed a misdemeanor punishable by a fine not exceeding $500 or imprisonment for not exceeding one year, or both, § 125B. Criminal laws are to be strictly

---

**13.** In *State v. Siegel,* 13 Md. App. at 460 we construed the federal act to mean that a state may require procedures that are more restrictive than those spelled out in the federal act, but in the absence of such statutory provisions the procedures of the federal act are controlling. The Court of Appeals in *State v. Siegel,* 266 Md. at 272, agreed: "Once the hurdle of finding an applicable Maryland law authorizing interception is overcome, compliance must be had with whichever law is more constricting, be it federal or state."

We point out that the Maryland wiretapping statute, Code, Art. 35, §§ 92-99, does not prohibit participant monitoring. The declaration of policy, § 92, states *inter alia:* "The interception and divulgence of a private conversation *by any person not a party thereto* is contrary to the public policy of this State, and shall not be permitted except by court order in unusual circumstances to protect the people." (emphasis added). Section 93 (a) (1) prohibits the obtaining or attempting to obtain "the whole or any part of a telephonic or telegraphic communication *to which such person is not a participant* by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by the participants." (emphasis added).

**14.** If the State statute be more restrictive than the federal act so as to prohibit participant monitoring by electronic devices, then the interception of communications in such circumstances would be lawful only if under the authority of an order which, although contemplated by the State statute, § 125A (b), must comply with the more restrictive dictates with respect to such orders of the federal act.

construed. *Wanzer v. State*, 202 Md. 601. The statute contains no provision for the exclusion of evidence obtained in violation of its provisions as is spelled out in the wiretapping laws, Code, Art. 36, § 97, and the federal act, 18 U.S.C. §§ 2515 and 2518 (10) (a). We read no such sanction into the electronic devices statute in the absence of any indication of legislative intent to that end.[15] Second, there is a historic bar against a judge's review, at a defendant's request, of grand jury action. *United States v. Blue*, 384 U. S. 251; *Lawn v. United States*, 355 U. S. 339; *Costello v. United States*, 350 U. S. 359. See *In re Ellsberg*, 446 F. 2d 954; *Bowie v. State*, 14 Md. App. 567. We are aware of no authority which compels us to remove that bar.[16]

We hold that the court below did not err in denying the motion to dismiss the indictments made on the ground relating to the use of electronic devices.[17]

---

**15.** Exclusionary rules have been fashioned by the courts for violation of constitutional rights. *United States v. Wade*, 388 U. S. 218; *Miranda v. Arizona*, 384 U. S. 436; *Mapp v. Ohio*, 367 U. S. 643. As we have seen, no constitutional right is here involved.

**16.** Proceedings before grand juries, although specified in § 2515 of the federal act, are omitted from § 2518 (10) (a) that authorizes "[a]ny aggrieved person" in specified types of proceedings, to "move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom." The opinion of the Court in *Gelbard v. United States*, 408 U. S. 41, said, at 59-60: "The congressional concern with the applicability of § 2518 (10) (a) in grand jury proceedings, so far as is discernable from the Senate report, was apparently that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments: 'Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforceable by an individual. [*United States v. Blue*, 384 U.:S. 252 (1966).] There is no intent to change this general rule.' S.Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968). The 'general rule', as illustrated in *Blue*, is that a defendant is not entitled to have his indictment dismissed before trial simply because the Government 'acquire[d] incriminating evidence in violation of the [law],' even if the 'tainted evidence was presented to the grand jury. 384 U.S. at 225 and n. 3; * * *." The Court cited *Lawn* and *Costello*. It read the statements in the Senate report to the effect that § 2518 (10) (a) "limits" § 2515, "to mean that suppression motions, as a method of enforcing the prohibition of § 2515, must be made in accordance with the restrictions upon forums, procedures, and grounds specified in § 2518 (10) (a)." 408 U. S. at 61.

We note that the holding in *Gelbard* was that where a grand jury witness is adjudicated in civil contempt for refusing without just cause shown to comply with an order of court to testify, the witness may invoke as a defense § 2515.

**17.** As indicated, because the use of the electronic devices here did not

(2)

## Speedy Trial

As to the indictments in the case here reviewed,[18] Pennington was arrested on 12 November 1969, presented and indicted the next day and tried on 11 December 1972. Although one counsel remained of record from the entering of his appearance on 28 November 1969, two co-counsel struck their appearances and a third co-counsel entered his appearance the day of trial. The time intervening between arrest and trial is replete with various motions filed by Pennington and hearings on them. There were exceptions to the discovery provided by the State and the matter was determined in a series of hearings. There were numerous motions — under Maryland Rule 717, to compel the State to elect, for severance, to inspect grand jury minutes, and to dismiss the indictments. There was a complaint filed by Pennington in the United States District Court for injunctive relief, seeking to prevent the alleged assignment of cases before a judge selected unilaterally by the State's Attorney. Pennington sought a federal court order that no hearing or other judicial proceeding under the 7000 or 9000 series of indictments take place before a decision on the complaint. Early in 1971 the State filed a motion for appropriate relief, alleging among other things, that Pennington's counsel had requested that the State not set a trial date until after the November election because Pennington desired to get his affairs in order and because his counsel was then a candidate for State's Attorney. The allegation was not denied in Pennington's answer.

---

violate the fourth amendment guarantee against unreasonable searches and seizures, the exclusionary rule invoked by violation of that guarantee is not applicable in any event.

18. Indictments were also filed against Pennington on 17 December 1969, presenting that he committed similar offenses relating to the case of State v. Kisner, in attempting to bribe and corrupt another police officer in an endeavor to "fix" that case. Those indictments, nos. 9060-9064, are referred to from time to time in the proceedings now before us, and the record regarding them was by order of this Court made a part of the record in the instant case at Pennington's request on his claim that they had some bearing on the issue of a speedy trial and prosecutorial conduct.

When Pennington first demanded a speedy trial in the case before us is not clear from the record. He filed such a motion in regard to the 9000 series of indictments on 7 April 1972 and those indictments were stetted 18 January 1973. In any event, during a hearing on 13 October 1972 on a motion to quash the 7000 series of indictments, grounded on the use of electronic devices, see *supra*, defense counsel requested time to submit a brief. The court refused, stating that the case had been too long delayed and that he was ready to rule. At that hearing the matter of a speedy trial was interjected. The judge, Liss, J., observed: "Mr. Pennington, through his counsel, has in bad faith tried to delay this thing for years in order to be able to make this motion, and I am not going to buy that." On the day of trial a motion was filed to dismiss the indictments for denial of a speedy trial. Pennington was asked by the trial judge why he waited so long to file the motion — "You're filing it on the date of this trial." Pennington replied: "Well, I'll submit on what is in the record at this time." The motion was subsequently denied by the trial judge. We have, as is our duty, made an independent constitutional appraisal of the entire record, and we conclude that the record supports the observation of Judge Liss. We have firmly established the rules with respect to the constitutional right to a speedy trial in myriad cases and see no warrant for further discussion of them. We find that such delay here as was chargeable to the State in bringing Pennington to trial was not of constitutional dimension. We hold that the court below did not err in denying the motion to dismiss the indictments made on the ground that Pennington was denied a speedy trial.

## II

### THE ALLEGATION OF PROSECUTORIAL MISCONDUCT

Pennington urges that the State was guilty of such prosecutorial misconduct as to have required a dismissal of the prosecution of him or, at the least, the prosecution having proceeded to judgments, that the judgments be set

aside and the case remanded for an evidentiary hearing, "so that the State's actions can be reviewed and the necessary consequences to the prosecution of these cases be determined." We find no such prosecutorial misconduct evident in the record before us as alleged and conclude that the contention is frivolous.

It seems that Pennington's contention was suggested by the action of the United States District Court for the District of California in *United States v. Russo and Ellsberg*, No. 93-73 (C.D. Cal. 1973). In that case the defense's motion for dismissal of the indictment "upon the totality of governmental misconduct, including the suppression of evidence, the invasion of the physician-patient relationship, the illegal wiretapping, the destruction of relevant documents and the disobedience of judicial orders", was granted. The court found that the "totality of the circumstances, of this case * * * offend 'a sense of justice.' The bizarre events have incurably infected the prosecution of this case." The court was of the opinion "in the present status of the case, that the only remedy available that would assure due process and the fair administration of justice is that this trial be terminated and the defendants' motion for dismissal be granted and the jury discharged." [19]

It is readily apparent from the record that the circumstances surrounding the prosecution of Pennington

---

**19.** Among the "bizarre events" set out by the court was that a special unit was established by White House officials to investigate one of the defendants. This unit apparently operated with the approval of the F.B.I. It came to Los Angeles, "cased" the office of a psychiatrist of one of the defendants, and planned and executed a break-in of that office in search of records concerning one of the defendants. The Central Intelligence Agency, at the request of the White House, provided disguises, photographic equipment and other paraphernalia for covert operations and gave to the special unit two psychological profiles on one of the defendants. The government time and again failed to make timely productions of exculpatory information in its possession, requiring delays and disruptions in the trial. After both sides rested their case, the prosecution revealed interception by electronic surveillance of one or more conversations of Ellsberg. It did not know how many such interceptions took place, what happened to the authorization for surveillance, or where the tapes, logs and other records pertaining to the overheard conversations were. Files regarding the surveillance at one time existed, but apparently had been removed from both the Justice Department and the FBI.

are not even remotely comparable to the events as set out in *Ellsberg*. The rationale of the *Ellsberg* decision is nowise applicable to the case at hand.

Equally without merit are Pennington's other contentions involving alleged prosecutorial misconduct. The court below did not err in not postponing the prosecution of the 7000 series of indictments to permit discovery with respect to the 9000 series of indictments or in refusing to order that the 9000 series be first tried. We note that severance as to the two series had been granted at Pennington's request. We agree with the court below that any controversy regarding discovery and inspection with respect to the 9000 series was no good cause to delay trial of the 7000 series. Which of the indictments were to be first tried was at the discretion of the prosecution. We find no harassment by the prosecution of such nature as to violate the attorney-client privilege. We think that a suggestion that the indictment of Pennington was merely to harass him is preposterous on the face of the record.

We hold that the court below did not err in refusing either to dismiss the indictments or to set aside the judgments because of the alleged prosecutorial misconduct.

*Judgments affirmed; costs to be paid by appellant.*