HENRY HUBERT CORENS *v.* STATE OF MARYLAND.

[No. 60, October Term, 1945.]

*Decided January 9, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*George B. Woelfel* and *Harold C. Smith* for the appellant.

*William Curran, Attorney General,* and *Joseph B.
Simpson, Jr., State's Attorney for Montgomery County,*
with whom were *Marvin I. Anderson, State's Attorney
for Anne Arundel County,* and *J. Edgar Harvey, Assistant Attorney-General,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Henry Hubert Corens, an automobile painter and mechanic, of Bethesda, 44 years old, was indicted by the
Grand Jury of Montgomery County for the murder of
his wife, Pearl W. Corens, on February 12, 1945. The
case was removed to the Circuit Court for Anne Arundel County, where he was tried and found guilty of
murder in the second degree. On May 28 he was sentenced by the court to confinement in the Maryland
Penitentiary for the period of 18 years. From the judgment he entered an appeal to this Court.

When the case came on for trial the State's Attorney
requested the court to ask each prospective juror on his
*voir dire* whether he would be willing to convict on
circumstantial evidence in a case where the penalty
might be death, inasmuch as the State expected to prove
the commission of the crime by circumstantial evidence.
Over the defendant's objection the court asked each juror
the following question: "Have you any such conscientious
scruple or opinions as would prevent or preclude you
from rendering a verdict of guilty in a case where the
penalty prescribed by law may be death upon what is
commonly called circumstantial evidence?" It is con-

tended that the question had a prejudicial effect by leading the jurors to believe that the judge had already decided that defendant was guilty and that circumstantial evidence was sufficient to convict. In Maryland there is no statute or precise rule prescribing the questions which should be asked a prospective juror on his *voir dire* in order to determine his qualification, but the subject is left largely to the sound discretion of the court in each particular case. In the exercise of that discretion, the trial judge should adapt the questions to the needs of each case in the effort to secure an impartial jury. In *Whittemore v. State,* 151 Md. 309, 314, 134 A. 322, Chief Judge Bond stated the broad rule that any circumstances which may reasonably be regarded as rendering a person unfitted for jury service may be made the subject of questions and a challenge for cause. In other words, an examination of a prospective juror on his *voir dire* is proper as long as it is conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him. It is unquestioned, for instance, that a person who has conscientious scruples against capital punishment cannot properly examine the evidence in a prosecution for a crime for which capital punishment may be imposed, because he does not stand impartial between the prisoner and the State. If it develops on the *voir dire* examination of a prospective juror that he has such conscientious scruples, the State may challenge him for cause. *State v. Ward,* 39 Vt. 225, 231; *Commonwealth v. Bentley,* 287 Pa. 539, 135 A. 310; *People v. Ah Chung,* 54 Cal. 398. We likewise hold that the State has the right to challenge a juror in a capital case on the ground that he would not be willing to convict on circumstantial evidence. *Cluverius v. Commonwealth,* 81 Va. 787; *Grant v. State,* 67 Texas Cr. R. 155, 148 S. W. 760, 42 L. R. A., N. S., 428; *Hochheimer, Criminal Law,* 2d Ed., Sec. 134; 31 *Am. Jur., Jury,* Sec. 159. We are unable to agree with the contention that, merely because the prospective jurors

were asked on *voir dire* examination to state their views on circumstantial evidence and capital punishment, they were thereby induced to believe that the judge was convinced before the trial began that the accused was guilty.

Defendant testified that he went to bed in his home on Gladwyne Drive about 9.30 o'clock on Monday night, February 12, and was awakened shortly before midnight by the radio; that he asked his wife to turn the radio down and then went back to bed; that a few minutes later she came into his room and angrily demanded whiskey, and hopped on him and scratched his face. "By that time," he said, "I sat up in bed and I slapped at her. She must have picked up something, * * * it must have been the heel of a shoe. She struck me here (indicating the forehead) and it knocked me out." According to his story, he regained consciousness within a few minutes and searched the house but she had disappeared. In the morning his right eye was bloodshot, his forehead swollen, his face scratched, and his lip cut. As the day was rainy and bad for painting, he stayed at home until noon; then went to a restaurant for lunch; returned home about 1.30; remained there until about 4.30; went to a moving picture theatre; drank several glasses of beer about 8.30; went home again and retired about 9.30. On Wednesday, February 14, he went back to work; but in the afternoon Mrs. Corens' brother, Ralph Walker, and his wife called to see him, and requested him to accompany them to the police station to report the disappearance. Detective John Leahy went to the home and examined the premises, and Corens promised to co-operate with him. During the following two weeks Corens lived alone.

On February 27 a woman's head was found by a fisherman on the Seneca Road in Fairfax County, Virginia, about a half mile south of the Potomac. After Officer Richard F. Utz, of Fairfax County, was given permission by the coroner to take the head to the police in Montgomery County, it was identified by three dentists as the head of Mrs. Corens. An examination disclosed

that the head had been severed from the body by a saw. That night Corens was called to the police station, where he was informed that his wife's head had been found. He retorted: "You would have to show it to me. I won't believe it." Detective Leahy made a midnight trip to the Corens home to search the basement again. Under the work bench he found a hack saw. He took this to Dr. Briggs J. White, a chemist of the Federal Bureau of Investigation, who found upon it stains of human blood. Defendant was questioned until after 4 A. M., charged with murder, and taken to the jail in Rockville. On the evening of February 28 he was brought to the State's Attorney's office, where he was permitted to see the woman's head in a basket.

The first objection to rulings on evidence arises from the exclusion of a question which the defense directed to Officer Utz, after he had narrated about the finding of the woman's head on the Seneca Road in Virginia. This question was: "Did you make any effort to ascertain or find out whether or not the person whose head was found has been killed or murdered around that section of the country?" Defendant's contention is that, if any part of the body of a resident of Maryland is found in another State, the police in that State ought to make an investigation, and that at the trial of this case he should have been permitted to show that no investigation had been made by Officer Utz. The law is established in this State that the method, scope and extent of cross-examination are within the trial court's discretion, and in the absence of an abuse of discretion will not be interfered with on appeal. We also accept the rule that cross-examination can relate only to the facts and incidents connected with matters stated in the direct examination of the witness, and if a party desires to examine a witness as to other matters, he must do so by making the witness his own. *Marino v. State,* 171 Md. 104, 187 A. 858; *Armiger v. Baltimore Transit Co.,* 173 Md. 416, 196 A. 111. The statement of Officer Utz that the head was found in Fairfax County was not contro-

verted, and no benefit could possibly be gained by cross-examining the witness in reference to the statement. Speaking of the question in dispute, the trial judge said: "That would only be negative evidence. Suppose he did or suppose he didn't." If counsel for the defense thought that Mrs. Corens had been murdered in Virginia, and that Officer Utz had any information on the subject, they could have called him as a witness for the defense.

Captain James McAuliffe, of the Montgomery County police, was asked to repeat his conversation with the defendant at the time of his arrest. The witness replied that he asked defendant whether he had ever been in Virginia, and defendant said "he had been across Chain Bridge, and a very short distance after he crossed Chain Bridge he came back." Defendant says the question should have specified the time of the trip, as his alleged reply may have misled the jury to believe that he had crossed the Potomac on the night of February 12, leading them to the inference that he carried his wife's body with him. What happened at the trial, however, was that when his attorney interrupted the examination to inquire when it was that he "went over there to Virginia," the State's Attorney requested that he be allowed to conduct the direct examination without interruption. Since defendant had the privilege of cross-examination, we find no reversible error in the testimony. The judge assured the defense in plain words: "You have a right in your cross-examination to ask all you want."

Defendant made objection when the State recalled Dr. J. W. Bird to the witness stand to explain a statement he had made on a previous day of the trial. Dr. Bird had testified that he knew the head was a woman's head because of the scalp, ears, lower jaw and hair. After other witnesses testified that there were no ears on the head, Dr. Bird was recalled and asked: "Did you mean to create the impression to the court and jury whether there were ears on the head you examined?" Defendant argues that Dr. Bird should not have been recalled to explain what he meant, as the jurors themselves had the

right to determine from his testimony the impression that he intended to create. But the law is clear that whether a witness, after his examination has been completed, may be recalled, either for explaining what his testimony meant or giving additional testimony, is a matter resting solely in the discretion of the trial court, and from the exercise of that discretion no appeal will lie. *Schwartze v. Yearly,* 31 Md. 270, 276; *Green v. Ford,* 35 Md. 82, 88; 6 *Wigmore on Evidence,* 3d Ed., Sec. 1898. Nevertheless, it is inconceivable that defendant was injured in any way by the doctor's explanation. He merely repeated that the ears had been destroyed along with the nose and eyes and other soft structures of the head.

In addition to the hack saw, a number of articles were taken out of the Corens home to be examined by Dr. White. These also were found to contain stains of human blood or fatty tissue. Dr. White testified that he found blood stains on the laundry trays, the Oxydol soap powder box, the wall behind the trays, the sewer pipe near the trays, the concrete floor of the basement, on a piece of paper from the basement, on the gas furnace, on the handle of a spade, on the handle of a mop, on the andirons, among the ashes from the fireplace trap containing a piece of clothing which Mrs. Corens had worn, on the blanket, sheet and pillow case from Corens' bed, and from a towel from his automobile. Dr. White also testified that he found human body tissue on the laundry trays, on the boards near the trays, on the sewer pipe, and on the clothes hanger. Defendant did not dispute that the exhibits were found in his home. In fact, he attempted to account for the blood spots and the tissue which the chemist found from the analyses. He swore that his finger was caught behind an automobile in December, 1944, and as a result of the accident he was off from work for more than a month, during which time he was often in the basement, and one night when he hit his finger the blood dripped upon the floor and his slippers. He also said that in January, 1945, a rabbit ran into his yard and he killed it with a stick and skinned

it in the basement "right there by the laundry trays." He further said that he killed quite a few chickens in the basement. There is also no objection to the findings of Dr. White from his chemical analyses. We accept the rule that facts ascertained by chemical analysis of the blood of a human being or a part of the human body may be stated by a competent chemist, provided that the thing analyzed is satisfactorily identified. *Chicago Cosmetic Co. v. City of Chicago,* 374 Ill. 384, 29 N. E. 2d 495; 22 *C. J., Evidence,* Sec. 741; 32 *C. J. S., Evidence,* Sec. 546.

Defendant, however, objects to the admission in evidence of the trays and other articles for the reason that the amount of blood and human tissue in some instances was so small that it was consumed in the analysis, and therefore the exhibits, which no longer contained any blood or tissue, violated the best evidence rule, especially since he was not present when the analyses were made. The fundamental rule underlying all legal proceedings is that the best evidence of which the case is capable must be produced. This rule means that secondary or inferior evidence shall not be substituted for evidence of a higher nature. "The reason of the rule," as Justice Wayne explained in *United States v. Wood,* 14 Pet. 430, 443, 10 L. Ed. 527, 534, "is, that an attempt to substitute the inferior for the higher, implies that the higher would give a different aspect to the case of the party introducing the lesser." When production of the best evidence is shown to be beyond the power of a party not at fault, the rule is satisfied with the best then obtainable. Secondary evidence is admissible to prove records that have been lost or destroyed without the fault of the party tendering proof of the same after it has been made to appear to the court that efforts have been made in good faith to produce them. It cannot be doubted that parol evidence is admissible to prove the existence and loss of a record. *Higgins v. Reed,* 8 Iowa 298, 74 Am. Dec. 305; 1 *Wharton, Criminal Evidence,* 11th Ed., Secs. 389, 390. Further, as clearly stated by the Supreme Court

of Tennessee in *Moore v. State,* 96 Tenn. 209, 33 S. W. 1046, 1047, the fact that an experiment, evidence of which is sought to be introduced for one litigant, was made in the absence of and without notice to the adverse litigant, does not render the evidence incompetent, but the circumstances under which the experiment was made may be considered by the jury as affecting the weight of the evidence. Further, we do not think the jury could have been misled by the number of boxes, which were used by the chemist to contain the blood and tissue from the articles taken from the home, and which were placed upon a table in view of the jury. It was carefully explained to the jury what each box contained, and we do not believe the boxes improperly influenced the jury to the prejudice of the defendant.

Defendant also objected to the introduction in evidence of certain photographs, which were taken at his home on March 3. He says that, since they were not taken until three weeks after the homicide, the court could not be positive that they were correct representations of the premises at the time of the homicide, as visitors had been in his home between February 12 and March 3. It is an unquestioned rule that photographs may be introduced in evidence, either in a civil or criminal proceeding, to illustrate the description of a person, place, or object so as to explain or apply the evidence. *Snowden v. State,* 133 Md. 624, 631, 106 A. 5. Whether a photograph is of any practical value in a particular case is a preliminary question for the trial court, and the court's exercise of discretion in determining the question is not open to review unless plainly arbitrary. Of course, photographs offered as exhibits should be correct representations of the person, place or object which they purport to represent at the time when the appearance of such person, place or object is relevant to the inquiry in connection with which the photographs are offered. If there is evidence of any change in condition or surroundings subsequent to the time of the occurrence in question, such change may lead to the exclusion

of the photograph, and certainly should do so whenever the substantial identity of the condition or surroundings has not been preserved. *Consolidated Gas, Electric Light & Power Co. v. State, to Use of Smith,* 109 Md. 186, 199, 200, 72 A. 651; *Wimpling v. State,* 171 Md. 362, 189 A. 248; *Smith v. State,* 182 Md. 176, 32 A. 2d 863, Undeniably an examination or photograph of a person or scene immediately after the commission of a crime is more satisfactory and conclusive than one made some time afterwards; but the mere fact that the examination or photograph is made some time afterwards is not in itself a reason why the result should be excluded, unless the interval is so great that the jury could not reasonably find whether the condition is to be attributed to ante-mortem or post-mortem causes. *Williams v. State,* 64 Md. 384, 391, 1 A. 887. In the case at bar there was no evidence of any change in the condition of the basement or other part of the Corens house between February 12 and March 3. Therefore, we cannot find any error in the admission of the photographs. The facts in this case are entirely different from *Pearson v. State,* 182 Md. 1, 9, 31 A. 2d 624, where an unexplained failure to produce the first photograph taken of the prosecuting witness was held to destroy the foundation for admitting another photograph taken later. The weight of the evidence in this case was for the jury, to be determined by them in connection with all the facts and circumstances of the case.

Defendant objected to the admission of two letters, which he wrote to his girl friend, Thelma Pack, at Petersburg, Tennessee, in November, 1944. He claims that his letters were irrelevant. The law is established that in a prosecution of a husband for the murder of his wife, the State may show by his conduct and statements a want of affection for his wife, and a desire to get rid of her, or that he was infatuated with some other woman or that he maintained intimate relations with her. *State v. English,* 201 N. C. 295, 159 S. E. 318; *Duncan v. State,* 88 Ala. 31, 7 So. 104; *Conner v. United States,* 9 Cir., 7 F.

2d 313. Accordingly, in the trial of a husband for the murder of his wife, letters to or from another woman, with whom he was intimate, are admissible to show a motive for the crime. *State v. MacFarland,* 83 N. J. L. 474, 83 A. 993, Ann. Cas. 1914B, 782; *Parks v. State,* 124 Tex. Cr. R. 405, 63 S. W. 2d 301; *Shepard v. United States,* 10 Cir., 62 F. 2d. 683. At the trial of this case defendant admitted that he had been intimate for about seven months with Miss Pack, who was 23 years old, and then employed in Washington. He took her to dances and other amusements several times a week, gave her jewelry, asked her to marry him, and pretended that he was divorced. It also appeared that he had been anxious for some time to obtain a divorce from his wife, but she blocked a decree. In our opinion the trial court did not go beyond the limits of judicial discretion in admitting the letters in evidence, even though written three months before the homicide. The question of how strained the relations were between the defendant and his wife was to be settled largely by circumstantial evidence, and any facts and circumstances which tended to throw light thereon and to show a motive for the crime were admissible in evidence. At stated in *Thiede v. People of Territory of Utah,* 159 U. S. 510, 16 S. Ct. 62, 65, 40 L. Ed. 237, great latitude should be allowed in the reception of circumstantial evidence, and where direct evidence is wanting, the more the jury can see of the surrounding facts and circumstances, the more correct their judgment is likely to be. It is recognized that, where the inquiry relates to the relations between a husband and his wife, some of the details may be somewhat minute and seemingly of little or no significance. But letters which, standing alone, may seem to be of slight importance might in connection with all the other testimony in the case have a bearing upon the existence of ill feeling toward the deceased wife and be relevant and material to show motive for the crime. *Commonwealth v. Mercier,* 257 Mass. 353, 153 N. E. 834, 839.

Finally, defendant says that the trial court committed error in refusing to have the jury visit his home to view the scene where the State claimed the crime was committed. He argues that the jury were entitled to such a view, especially since the evidence was circumstantial. But we must follow the general rule, accepted both in this country and in England, that the granting or refusing of a request to allow the jury to view the premises where a crime is alleged to have been committed is within the discretion of the trial court. *Commonwealth v. Chance*, 174 Mass. 245, 54 N. E. 551, 75 Am. St. Rep. 306. In support of this rule, Professor Wigmore wrote that the inconvenience of adjourning court until a view can be had, or of postponing the trial for the purpose, may suffice to overcome the advantages of a view, particularly when the nature of the issue or the object to be viewed renders the view of small consequence. 4 *Wigmore on Evidence*, 3d Ed., Sec. 1164.

As we find no reversible error in the rulings of the trial court, the judgment must be affirmed.

*Judgment affirmed, with costs.*