# JAMES REED, JR. *v.* STATE OF MARYLAND

[No. 655, September Term, 1976.]

*Decided April ·7, ·1977.*

The cause was argued before GILBERT, C. J., and MOYLAN and LISS, JJ.

*William T. Wood,* Assigned Public Defender, for appellant.

*Deborah K. Handel,* Assistant Attorney General, with whom were *Francis B. Burch,* Attorney General, *Andrew L. Sonner,* State's Attorney for Montgomery County, and *Steven A. Shaw,* Assistant State's Attorney for Montgomery County, on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The concept of spectrography had its genesis in World War II. At that time, the Allied Intelligence Service ideated that if the specific identity of German radio operators could be ascertained the Allies would be able to follow the movement of enemy forces in Europe. Bell Telephone Laboratories was requested to, and did, develop the spectrograph for the purpose of identifying speakers.

According to Dr. Oscar Tosi,[1] spectrography "consists of comparing both aurally and visually spectrograms of a questioned voice and a known voice, and on the basis of similarities to decide whether or not the two voices, the questioned and the known voice, are the same or belong to different persons."[2]

Spectrography, a relative newcomer to the law of evidence, compared with fingerprints and ballistics, has been admitted in some courts[3] but rejected in others.[4] Those

1. Doctor Tosi is a Professor at Michigan State University. He is the Director of the Speech and Hearing Sciences Research Laboratory of the University, as well as Associate Dean of the College of Communication. Doctor Tosi has authored two (2) books, five (5) chapters in five (5) different books, and forty-five (45) papers on the subject. Additionally, the Doctor has appeared as an expert witness in excess of fifty (50) times in fifteen (15) states, Italy, Spain, Germany, France, and Canada.

2. " 'The sound spectrograph consists of four basic parts: (1) a magnetic recording device, (2) a variable electronic filter, (3) a drum which is coupled to the magnetic recording device and carries a sheet of special paper, [sensitive to] . . . (4) an electric stylus which marks the paper as the drum rotates. The magnetic recording device is first used to record a short sample of speech; the duration of the speech sample corresponds to the time required for one revolution of the drum [e.g. 2.4 seconds]. The speech sample is then played back over and over again in order to analyze its spectral contents. For each revolution of the drum, the variable electronic filter passes only a certain band of frequencies, and the energy in this frequency band activates the electric stylus so that a straight line of varying darkness is produced across the paper. The darkness of the line at any point on the paper indicates how much energy is present in the speech signal at the specified time within the given frequency band. As the drum revolves, the pass-band of the variable electronic filter moves to increasingly higher frequencies, and the electric stylus moves parallel to the axis of the drum. Thus, a pattern of closely spaced lines is generated on the paper.' (Comment, Evidence: Admissibility of Spectrographic Voice Identification, 56 Minn. L. Rev. 1235, 1239; Hecker, Speaker Recognition: An Interpretative Survey of the Literature, Am. Speech and Hearing Assn. Monographs No 16 (1971) at pp. 50-51.)" People v. Law, infra, at 114 Cal. Rptr. at 712, n. 7.

3. United States v. Jenkins, 525 F. 2d 819 (6th Cir. 1975); United States v. Baller, 519 F. 2d 463 (4th Cir. 1975); United States v. Franks, 511 F. 2d 25 (6th Cir.), cert. denied, 422 U. S. 1042, 95 S. Ct. 2654 and 56, 45 L.Ed.2d 693 and cert. denied, 422 U. S. 1048, 95 S. Ct. 2667, 45 L.Ed.2d 701 (1975); United States v. Sample, 378 F. Supp. 44 (E.D. Pa. 1974); Hodo v. Sup. Ct., 30 Cal. App. 3d 778, 106 Cal. Rptr. 547 (1973); Alea v. State, 265 So. 2d 96 (Fla. App. 1972); Worley v. State, 263 So. 2d 613 (Fla. App. 1972); Commonwealth v. Vitello, 327 N.E.2d 819 (Mass. 1975); Commonwealth v. Lykus, 327 N.E.2d 671 (Mass. 1975); State ex rel. Trimble v. Hedman, 291 Minn. 442, 192 N.W.2d 432, 49 A.L.R.3d 903 (1971); People v. Rogers, 385 N.Y.S.2d 228 (1976); State v. Olderman, 44 Ohio App. 2d 130, 336 N.E.2d 442 (1975).

4. United States v. McDaniel, 538 F. 2d 408 (D.C. Cir. 1976); United States v. Addison, 498 F. 2d 741 (D.C. Cir. 1974); People v. Kelly, 130 Cal.

jurisdictions which permit the introduction of spectrography do so on the ground that its reliability has been demonstrated and that the expert through whom the evidence is offered is properly qualified to give an opinion on the subject. *People v. Kelly, supra,* 130 Cal. Rptr. at 148.

The generally recognized test applied to new scientific techniques was articulated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). There, Justice Van Orsdel stated for the Court:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." [5] 293 F. at 1014.

After hearing "Everything you always wanted to know about spectrographs but were afraid to ask," [6] Judge John F. McAuliffe, in the Circuit Court for Montgomery County, admitted into evidence for the first time in Maryland, spectrography analysis, also known as "voice print," in the trial of James Reed, Jr., appellant, for rape, perverted practice, robbery, verbal threat and unlawful use of a telephone.

On appeal to this Court, appellant assigns six reasons, in question form, as to why the judgments of the circuit court should be reversed. We shall discuss each of the issues in the

Rptr. 144, 549 P. 2d 1240 (1976); People v. Law, 40 Cal. App. 3d 69, 114 Cal. Rptr. 708 (1974); People v. King, 266 Cal. App. 2d 437, 72 Cal. Rptr. 478 (1968); State v. Cary, 99 N.J. Super. 323, 239 A. 2d 680 (1968), *aff'd* 56 N. J. 16, 264 A. 2d 209 (1970) (Notwithstanding *Cary,* we observe that the question is still open in New Jersey. *See* State v. Andretta, 61 N. J. 544, 296 A. 2d 644 (1972); Commonwealth v. Topa, Pa., 369 A. 2d 1277 (1977).

5. The Court, in *Frye,* rejected the lie detector test.

6. With apologies to Dr. David Reuben, author of *"Everything You Always Wanted to Know About Sex But Were Afraid to Ask."*

order that they have been posed to us. Antecedent to our discussion, however, we briefly recount the bizarre circumstances from which this case arose.

In the early morning hours of September 15, 1974, the prosecutrix arrived at her home, parked her car in the driveway, and began walking towards her front door. At that time, she was approached by a man who indicated that he had either a gun or a knife. This man ordered her to go with him to a wooded area behind her house. There he made her disrobe. He removed his penis from his trousers. He commanded her to commit fellatio on him, and then he had sexual intercourse with her.

At approximately 12:30 p.m. of the same day, the victim, whose purse was taken by her assailant, received a telephone call from a person who identified himself as the man who had raped her hours earlier. The prosecutrix notified the police. Corporal Thomas Evans, a detective with the Montgomery County Police Department, affixed, by suction cup, a cassette tape recorder to the prosecutrix's telephone. The recorder and the tapes belonged to the Montgomery County Police Department. Another detective instructed the prosecutrix on how to use the machine. The rape victim received and recorded telephone conversations on September 15, 17, and 18 (one call was actually recorded by the victim's daughter). There were eight (8) conversations in all, including the original call.

After each recordation, the prosecutrix telephoned Corporal Evans. He, in turn, would arrange for someone from the police department to pick up the used tape and replace it with another one. Corporal Evans kept the used tapes locked in his desk drawer. After the Corporal made a master composite tape of all the recorded conversations, he returned the individual tapes to the police department secretarial pool for dictation use.

· During the course of a telephone conversation in which the prosecutrix's caller asked to have intercourse with her again, she offered to pay him $1,000 in lieu of intercourse "[e]ven though there's no guarantee that I [the caller] won't bother you. . . . The only thing you have is my word." In a

subsequent conversation, the prosecutrix and her caller arranged for the prosecutrix to deliver $1,000 in a white envelope to the locker room of the Greyhound Bus Station in the District of Columbia. She was to find the key of locker number 326 on top of an electrical "plug" box, open the locker and place the envelope therein, and return the key to its original location on the box. The prosecutrix then complied with her caller's instructions.

Thereafter, the appellant appeared at the bus station, entered the locker room, picked up the key from the box and proceeded to locker 326. As he approached the locker, Sergeant Lanigan of the District of Columbia Police Department, who had been watching the locker room from a hole drilled in the door between the locker and boiler rooms, emerged from the boiler room. After a brief struggle with appellant, Sergeant Lanigan placed him under arrest.

The appellant was then placed in a lineup at the Montgomery County Detention Center. The prosecutrix was unable visually to recognize anyone, but after hearing the participants in the lineup speak, she identified with 85-90% certainty the appellant as being the person who raped and called her.

Eventually the master tape was sent to the Michigan State Police where Sergeant Lonnie Smrkovski [7] compared by spectrograph the master tape with voice exemplars made by appellant. Sergeant Smrkovski formed the opinion and was allowed to testify at trial that the voice on the master tape and that in the exemplars was one and the same.[8]

---

7. Sergeant Smrkovski, a member of the Michigan Department of State Police for ten years has been assigned to the "Voice Identification Unit" of the Scientific Crime Laboratory of the Michigan State Police for "a little over five years." He currently is in charge of the Voice Identification Unit. The Sergeant has studied speech pathology at Northern Michigan University, Michigan Technological University, and holds a bachelor's degree from Michigan State University in Audiology and Speech Sciences. He is currently working toward his master's degree. Sergeant Smrkovski has studied under Doctor Tosi and is in daily contact and consultation with Doctor Tosi. The Sergeant has qualified in six or seven states as an expert on voice identification and has never been rejected as an expert in the field by a court.

8. Harry Hollien, Professor of Speech at the University of Florida and Director of the Institute for Advanced Study of Human Communication, witness for the defense, testified, "I cannot conceive of how one [a valid

## I.

### "Did the trial court err in permitting, for the first time in the State of Maryland, the process of voice

voice comparison for identification purposes] could be made from the quality of spectrogram that had very much use from the high noise levels here."

Other experts also testified for the defense at the trial. They were of the opinion, in essence, that the spectrograph has not, as yet, established its reliability for use in evidence.

Sergeant Smrkovski testified that he spent about eighty (80) hours making the spectrograms, including listening to the tapes and visual analysis. With respect to seven telephone calls made to the prosecutrix by her rapist, the Sergeant stated:

"In my opinion the ... known voice of Mr. James Reed, Jr. [appellant], and the unknown call in Call 1 are positively one and the same."

. . . .

"I didn't analyze Call 2 because of its very short duration."

. . . .

"I found 12 different words that were similar. I found similarities which were indicative of the same speaker in Call 3."

. . . .

"My opinion is that the ... known voice of ... [appellant] and the unknown speaker in Call 3 are positively one and the same."

. . . .

"I found 48 words containing similarities between the known and questioned voice, 39 of which were different words on Call 4."

. . . .

"It is my opinion that the ... known voice of ... Reed ... and the unknown caller in Call 4 were one and the same speaker."

. . . .

"In Call No. 5 I found similarities in 20 different words where he was repeating the sample, and 21 different words where he was reading the sample. . . ."

. . . .

"My opinion is that the ... known voice of ... Reed ... and the unknown speaker's voice in Call No. 5 were one and the same person."

. . . .

"Call No. 6, I found 20 different words in which I found similarities between the known and questioned voice."

. . . .

"My opinion is that the known voice of ... Reed ... and the unknown speaker's voice in Call No. 6 are positively one and the same."

No analysis was made on "Call No. 7" because, "That was distorted. It was very short."

We point out that this evidence was produced at trial, not at the preliminary hearing and was, therefore, an issue for the trier of fact — in this case — the jury. See Dobson v. State, 24 Md. App. 644, 649 n. 2, 335 A. 2d 124, 127 (1975).

identification through spectrographic analysis, introduced through a police sergeant, to be used as substantive proof?"

To determine the admissibility of the spectrograhic evidence at trial, a pretrial suppression hearing was conducted. Appellant, through his counsel, vigorously sought to discredit voice identification. Appellant zeroed in on the "error" factor that is present in an effort to succeed in having the trial judge reject testimony concerning spectrographic analysis as unreliable. Doctor Tosi conceded an error rate of roughly 2% in identification through voice print but pointed out that the 2% error rate is in elimination, not identification. In Tosi's view, a guilty person may be excluded, but an innocent person will not be included. There was expert testimony that the error rate could be considerably higher. Dr. Donald J. Baker, Associate Professor of Hearing and Speech in the Division of Behavioral Social Sciences at the University of Maryland, testified that based upon his readings on the subject of spectrography he thought the error rate for false identification could be as high as 16%.[9]

One of the problems surrounding spectrographic analysis in general and the spectrograph in particular had its origin with the inventor, Lawrence Kersta, who was with Bell Laboratories, and who announced that voice prints had the infallibility of fingerprints.[10] That statement, seemingly equating his invention to Newton's Law of Gravity, was a "red flag" for the scientific community. It created an aura of dubiety that still clings tenaciously to the subject of spectrography. Although great strides have been made since Kersta's comment, there are still many disbelievers.

What has been proven and is acceptable scientifically is usually legally admissible evidence, but what is legally

9. The State also produced John A. McClung, Professor at Wayne State University, and Leendert P.C. Jansen, of the National Physical Research Laboratory, Pretoria, South Africa, as experts. Both men testified as to the reliability of the spectrographic process.

10. In People v. King, *supra*, the court quotes Kersta as having been able to identify speakers in his test with an accuracy of 99.65%.

480

admissible is not necessarily scientifically accepted. Scientists deal in exactitudes, the law in reasonable probabilities. As Judge McAuliffe opined at the pretrial hearing, "If we did not decide cases except where things were absolutely and mathematically certain, we would not ever decide cases. Even in a criminal case proof beyond a reasonable doubt does not require mathematical certainty." [11]

Were the courts to rely upon "absolute certainty" in order for forensic evidence to be admissible, many of those areas of scientific expertise commonly received into evidence would of necessity be rejected. By way of example, speed, [12] handwriting, [13] ballistics, [14] neutron activation test, [15] seminal stain test, [16] blood tests, [17] analysis of hair and soot, [18] and fibers, [19] are all ". . . known to be incapable of resulting in positive identification . . .", *People v. Rogers, supra*, 385 N.Y.S.2d at 234, yet the acceptance of such evidence is widely upheld.

In the cases that refuse to permit the introduction of voice prints, *supra* note 4, the common thread permeating them is that the science of spectrography has not reached the point where it passes muster under the *Frye* test. In *United States v. Addison, supra*, the United States Court of Appeals for

---

11. The controversy over the admission into evidence of spectrograms brings to mind what Thomas Jefferson wrote to the Secretary of the Treasury, September 20, 1808. "It is well known that on every question the lawyers are about evenly divided, . . . and were we to act but in cases where no contrary opinion of a lawyer can be had, we should never act."

12. United States v. Dreos, 156 F. Supp. 200 (D. Md. 1957); Uhlik v. Kopec, 20 Md. App. 216, 314 A. 2d 732 (1974).

13. Green v. State, 23 Md. App. 680, 329 A. 2d 731 (1974).

14. Edwards v. State, 198 Md. 132, 81 A. 2d 631, 26 A.L.R.2d 874, *reh. denied*, 198 Md. 152, 83 A. 2d 578, 26 A.L.R.2d 886 (1951); Van Meter v. State, 30 Md. App. 406, 352 A. 2d 850 (1976).

15. Kelly v. State, 16 Md. App. 533, 298 A. 2d 470 (1973).

16. Murphy v. State, 184 Md. 70, 40 A. 2d 239 (1944); Bailey v. State, 16 Md. App. 83, 294 A. 2d 123 (1972); Coward v. State, 10 Md. App. 127, 268 A. 2d 508 (1970).

17. Shanks v. State, 185 Md. 437, 45 A. 2d 85 (1945).

18. Robinson v. State, 18 Md. App. 678, 308 A. 2d 734 (1973).

19. Tomolillo v. State, 4 Md. App. 711, 245 A. 2d 94 (1968).

the District of Columbia, through a three judge panel, held in 1974 that voice prints were ". . . not now sufficiently accepted by the scientific community as a whole to form a basis for a jury's determination of guilt or innocence." 498 F. 2d at 745. Nevertheless, the Court affirmed the judgment on the ground that the error in admitting the evidence was harmless in view of the overwhelming record of guilt. *Addison*'s application of *Frye* to the spectrographic analysis, has been questioned by a different panel of judges of the same court in *United States v. McDaniel, supra,* decided in 1976. 538 F. 2d at 413. *McDaniel* did, however, apply *Addison,* and held the voice print testimony to be inadmissible, while arriving at the same ultimate conclusion as *Addison,* that the error in permitting the introduction of spectrographic analysis was, in the circumstances of the case, harmless.

The Superior Court of New Jersey, Law Division, also declined, in 1968, to allow evidence concerning spectrograms in *State v. Cary, supra.* That holding was affirmed in 1970, by that State's Supreme Court, *State v. Cary, supra.* Two years later, however, the latter court ordered voice exemplars made of two defendants charged with extortion. In so doing, the court said that because of ". . . developments since *Cary,* we believe that it is no longer unreasonable to order these defendants to speak for purposes of this test." *State v. Andretta, supra* at 648. Thus, the support provided appellant in the instant case by *Addison* and *Cary* is somewhat eroded.

The California Court of Appeals split into two factions, those that deem voice prints acceptable and those that do not.[20] The conflict was resolved in 1976 by the California Supreme Court in *People v. Kelly, supra.* That court spurned spectrograms on the ground that they had not yet reached

---

20. The Court of Appeals, Second District, held such evidence inadmissible in 1968. People v. King, *supra.* The Fourth District permitted voice print in Hodo v. Super. Ct., *supra.* Hodo, however, did not directly involve the use of voice print at trial. When the case went to trial on its merit, the defense produced testimony of Dr. Peter Ladefoged to refute that of the State. As a result of the defense expert's evidence, the spectrographic analysis was stricken.

the ". . . degree of general scientific acceptance as a reliable identification device. . . ." 130 Cal. Rptr. at 146.

Until the recent decision of the Pennsylvania Supreme Court in *Commonwealth v. Topa, supra,* California was the only jurisdiction that disallowed spectrograms without a latter day question being raised by the same court as to the wisdom of its holding.

Pennsylvania's rejection of spectrographic evidence in *Commonwealth v. Topa, supra,* centered on the fact that only one expert's testimony, that of Lieutenant Ernest W. Nash, was available for the court's assessment of the spectrograph's validity. The court held that Lieutenant Nash's ". . . opinion, alone, will not suffice to permit the introduction of such scientific evidence into a court of law." Pa., 369 A. 2d 1277 at 1281. We observe that the testimony of numerous expert witnesses was available in the instant case, and that, therefore, *Topa* is inapposite.

We live in a society that wants guaranteed answers to its questions, and we want them now.[21] The difficulty is in finding absolute answers. The law compensates for the lack of positive answers by substituting, in criminal cases, proof beyond a reasonable doubt.[22] That expression, of course, does not mean proof to a mathematical certainty. We accept without question such a standard and subject a person to monetary loss, imprisonment, or even death; yet, in the field of scientific endeavor, we insist upon some higher standard before we admit such endeavor into evidence. Patently, there is something inconsistent in our approach.

We have no hesitancy in allowing a witness to testify that he recognized the voice of a defendant over the telephone, because he was familiar with that voice, even though the witness would be unable to state that the caller was not an impersonator. At the same time, a spectrographic expert,

---

21. H. Markey, *A forum for technocracy,* 60 Jud. 365, 366 (1977).

22. In the ordinary civil case, we use a "preponderance of evidence" test, while in suits for fraud and the like we have adopted a "clear and convincing" standard.

after analysis of defendant's voice and that of the caller, could reach a more definite result and eliminate to a degree the possibility of an impersonator.

An examination of the cases cited in note 3 will reveal that spectrographic analysis evidence is sanctioned in five States, namely, Florida, Massachusetts, Minnesota, New York, and Ohio, two federal circuits, the 4th and 6th, and by the United States District Court for the Eastern District of Pennsylvania. We believe, in the light of the decisions from those jurisdictions, that the *Frye* test has been met, and we hold that spectrographic analysis evidence, under proper safeguards, is admissible in Maryland. In so holding, we reject the *Addison* rationale and that of *Kelly*. We think that spectrograms have now, in the words of *Frye*, ". . . gained general acceptance in the particular field in which it belongs."

In our view, it is better to permit the introduction of relevant scientific evidence and allow the fact finder to assess its weight after cross examination and refutation, unless there is a widely accepted exaggerated popular opinion of the accuracy of a particular technique which causes its use to be misleading or prejudicial. *United States v. Baller, supra,* 519 F. 2d at 466; *United States v. Stifel,* 433 F. 2d 431 (6th Cir. 1970). *See also* McCormick, *Evidence* § 203 at 490-91 (2d ed. 1972).

We have indicated that proper safeguards should surround the admission of spectrographic analysis testimony. By that we mean the trial judge must, through carefully worded instructions, see that the jury does not give undue weight to spectrograms because of their relative newness in the evidentiary area, and the jury must be apprised that it may accept or reject the expert's opinion or assign to it whatever weight it believes is merited. *People v. Rogers, supra.* We share the belief of the Fourth Circuit, ". . . that it is better to avoid using 'voiceprint' in favor of a more neutral term such as 'spectrogram,' whenever possible." *United States v. Baller, supra,* 519 F. 2d at 465, n. 1.

## II.

"Was the best evidence rule violated when the trial court permitted either a second or third-hand copy of a criminal voice tape to be used for comparison purposes when the original tape was destroyed by the gross negligence of the investigating police officers, and the second copy lost or destroyed without explanation?"

After keeping for a prolonged period of time the original cassette tapes upon which the conversations between the prosecutrix and her assailant were recorded, Detective Evans re-recorded the contents of the cassettes onto a master tape. The original cassettes were then returned to the department stenographic pool from which they had been on loan. Although a search was made for the originals, they were not found. At trial, the State offered the "master tape" which the trial judge received into evidence over the objection of the appellant that the admission of the "master tape" was a clear violation of the best evidence rule.

To underpin his argument that the trial court erred in permitting the introduction of the secondary evidence, *i.e.*, the master tape, the appellant cites *Wharton's Criminal Evidence* (12th ed. 1955) and *Corens v. State*, 185 Md. 561, 45 A. 2d 340 (1946).

Section 592 of 2 *Wharton's Criminal Evidence* (12th ed. 1955) states in pertinent part:

"When the best evidence rule is applicable, primary evidence must be presented if available. If this is not available, secondary evidence may be admitted if the absence of the primary evidence was not due to the fault or negligence of the party offering the secondary evidence." (Footnotes omitted.)

The same author, in section 593, declares:

"Secondary evidence is admissible to prove the contents of documents that have been lost or destroyed without the fault of the party tendering

proof of same, it first having been made to appear to the court that such documents existed, and that efforts have been made, in good faith, to produce them in court." (Footnotes omitted).[23]

The Court of Appeals, in *Corens v. State, supra,* said,

"When production of the best evidence is shown to be beyond the power of a party not at fault, the rule is satisfied with the best then obtainable. Secondary evidence is admissible to prove records that have been lost or destroyed without the fault of the party tendering proof of the same after it has been made to appear to the court that efforts have been made in good faith to produce them." 185 Md. at 569, 45 A. 2d at 346.

In *Forrester v. State,* 224 Md. 337, 167 A. 2d 878 (1961), the Court approved the trial judge's refusal to allow Forrester to relate alleged conversations which he had heard from a taped wiretap conversation between two other individuals. Noting that ". . . no effort was made to produce the original tape, nor any explanation offered for its nonproduction," the Court said:

"The best evidence of which the case is capable must be produced, and secondary, or inferior, evidence is only admissible after a proper foundation has been laid, showing good and sufficient reasons for the failure to produce the primary evidence. *Corens v. State,* 185 Md. 561, 569, 45 A. 2d 340; *Gray v. State,* 181 Md. 439, 443, 30 A. 2d 744; *Barranco v. Kostens,* 189 Md. 94, 97, 54 A. 2d 326. 4 Wigmore, *Evidence* (3rd Ed.), Section 1182." 224 Md. at 349, 167 A. 2d at 884.

The appellant reasons, based on the quoted sections of Wharton's, *Corens* and *Forrester,* that because Detective

---

**23.** Both sections 592 and 593 of *Wharton's Criminal Evidence,* (12th ed. 1955) appear to have been incorporated into 3 *Wharton's Criminal Evidence* § 534 (13th ed. 1973).

Evans re-recorded onto the "master tape" from which he also made other tapes, and sent the original cassettes back to the stenographic pool where they have been either erased or lost, that the *fault* lies with the State. Appellant then concludes that the secondary evidence is thus rendered inadmissible. To reach that conclusion, however, we would have to interpret the word "fault" to mean a multitude of things, including carelessness, negligence, wantonness and perhaps stupidity.

It is apparent to us that neither Wharton nor the Court of Appeals meant "fault" to have such an all inclusive meaning. Judge Thompson, for this Court in *Anderson v. State*, 9 Md. App. 532, 539, 267 A. 2d 296, 300-301, *cert. denied*, 259 Md. 729 (1970), explained that:

> "[I]n one sense any document [or tape] in possession of state officials cannot be lost without at least some minor fault by some official or employee of the State; but we think the rule is more fully stated in 1 Jones, *Evidence*, § 238: 'If the loss or destruction of the instrument is shown to have been intentional, *and* for the purpose of making it unavailable at the trial secondary evidence would be inadmissible" citing 4 Wigmore, *Evidence*, § 1198 (3d Edition) which gives a full discussion of the problem." (Emphasis supplied.)

Under *Anderson,* secondary evidence is admissible unless the primary or best evidence was destroyed or lost 1) intentionally *and* 2) for the purpose of making it unavailable at trial. While it cannot seriously be contended, in the instant case, that the original tapes were not intentionally lost or destroyed, there is no evidence that such was done for the purpose of making them unavailable at trial.

We think *Anderson* to be dispositive of the appellant's contention and that Judge McAuliffe properly admitted the secondary evidence.

## III.

"Did the trial court err in admitting a copied recording of a telephone conversation as said telephonic interception was not pursuant to a court order and was otherwise illegal?"

The record is not clear whether a suction cup device recorder was placed on the telephone of the prosecutrix at her suggestion or that of Detective Evans, but, in any event, there was no prior court order authorizing the intercept.

Title 18 U.S.C. § 2511 (2) (c), permits an intercept of a wire or oral communication when the interceptor is one of the parties to the communication or one of the parties has given prior consent to the interception. It is obvious that the prosecutrix was either the interceptor or had given her prior consent to the interception. In fact, she operated the recorder whenever she received a telephone call from the rapist, so that the interception clearly falls within the exception spelled out in Title 18 U.S.C. § 2511 (2) (c).

Appellant recognizes the existence of the exception and its validity in this case, but urges that Md. Ann. Code art. 27, § 125A proscribes such interception irrespective of the Title 18 provision.[24]

Md. Ann. Code art. 27, § 125A provides in pertinent part:

"(a) *Use without knowledge or consent prohibited.* — It is unlawful for any person in this State to use any electronic device or other device or equipment of any type whatsoever in such manner as to overhear or record any part of the conversation or words spoken to or by any person in private conversation without the knowledge or consent, expressed or implied, of that other person.

(b) *Prevention of crime or apprehension of criminal — Petition for ex parte order authorizing*

---

24. State v. Siegel, 13 Md. App. 444, 285 A. 2d 671 (1971), *aff'd* 266 Md. 256, 292 A. 2d 86 (1972) holds that the State may adopt more restrictive provisions relative to wiretapping than those contained in Title 18.

*use.* — However. if il shall appear to a duly authorized public law enforcement officer of this State that a crime has been, or is being, or is about to be committed, and that the use of such electronic devices are required to prevent the commission of the said crime, or to apprehend the persons who shall have committed it, then the law enforcement officer or officers shall submit to the State's attorney of the county or of Baltimore City the evidence upon which the said law enforcement officer bases his contention that an ex parte order authorizing the use of the said electronic devices is necessary; and if it shall appear to the said State's attorney that there are reasonable grounds to believe that a crime has been committed or is being committed or may be committed then the said State's attorney shall apply to any of the judges of the circuit court of the county or of the Supreme Bench of Baltimore City . . . . any such ex parte order shall be issued. . . ."

The question posited by appellant was answered by this Court, speaking through then Chief Judge Orth in *Pennington v. State,* 19 Md. App. 253, 310 A. 2d 817 (1973), *cert. denied,* 271 Md. 742, *cert. denied,* 419 U. S. 1019, 95 S. Ct. 492, 42 L.Ed.2d 292 (1974). In *Pennington,* we noted that although Md. Ann. Code art. 27, § 125B makes it a misdemeanor to overhear or record, by electronic device, any conversation without the consent of all the parties to that conversation there is no other sanction provided in the statute. We said, "The statute contains no provision for the exclusion of evidence obtained in violation of its provisions as is spelled out in the wiretapping laws, Code, Art. 36,[25] § 97, and the federal act, 18 U.S.C., §§ 2515 and 2518 (10) (a)." 19 Md. App. at 278, 310 A. 2d at 830.

---

**25.** The reference should be to Md. Ann. Code art. 35, § 97, which provides that telephonic or telegraphic communications shall not be intercepted without a prior court order or without the consent of parties thereto, and that any evidence obtained in violation thereof shall be excluded.

While it is conceivable, but unlikely, that both the prosecutrix and Detective Evans could be prosecuted for violation of Md. Ann. Code art. 27, § 125A, that occurrence would not affect the introduction into evidence of the recordings which were properly admitted.

## IV

"Did the trial court err in permitting the complainant and other state witnesses to testify that the complainant identified the voice of her assailant in a lineup and was the purported identification otherwise unreliable?"

Following the appellant's arrest, he, along with five other persons, was placed in a lineup. The prosecutrix was advised that the person arrested at the bus station was one of the persons in the lineup. She was unable to identify visually any of the six persons, but after listening to all of them speak, the prosecutrix requested that she be allowed to listen to them on the telephone. Her request was denied. She then indicated that she was 85% to 90% certain that the voice of No. 3 in the lineup, the appellant, was that of her assailant.

At a pretrial hearing, Judge McAuliffe ruled that the identification procedure was not impermissibly suggestive.

The assistant State's attorney, in his opening statement at trial on the merits, referred, without objection, to the identification made by complainant at the lineup. Later when the prosecutrix was asked about the lineup, a bench conference was held out of hearing of the jury, and it was agreed that the testimony produced at the pretrial hearing would be incorporated by reference, but not repeated. The objection to the introduction of the evidence was overruled.[26]

---

26. The State argues that the issue of identification is not properly before us as it was not preserved for review. We see it in a different light.

Evidence of the identity of a defendant may be challenged by a motion to exclude or suppress made before or during trial or by an objection to the evidence when it is offered. Md. Rules 725 and 522. See Townsend v. State, 11 Md. App. 487, 275 A. 2d 191 (1971); Jones v. State, 9 Md. App. 455, 265 A. 2d 271, cert. denied, 258 Md. 728, cert. denied, 400 U. S. 906, 91 S. Ct. 148, 27 L.Ed.2d 144 (1970); Smith v. State, 6 Md. App. 59, 250 A. 2d 285 (1969), cert. denied, 397 U. S. 1057, 90 S. Ct. 1402, 25 L.Ed.2d 674 (1970). If the motion is

We believe there is, in this case, no justification for exclusion of the identification. At the suppression or exclusion hearing, the burden is on the defendant to show, *prima facie*, that the pretrial confrontation was illegal, and if he so shows, the burden then shifts to the State to demonstrate by clear and convincing evidence that the identification was legal. *Smith v. State, supra*, 6 Md. App. at 68, 250 A. 2d at 291. Our constitutionally mandated independent examination of the record leads us to conclude that the appellant failed to sustain his burden of proof.

The victim, though unable visually to identify her assailant, was familiar with his voice as the result of several telephone calls. She had listened carefully to the voice of the caller on those occasions and was able to state that she was 85% to 90% sure that the appellant was her assailant. In addition, the length of time between the crime itself and the lineup was only four days.

There was nothing in the composition of the lineup itself that could be termed impermissibly suggestive. Despite the fact that there was no advance screening of the lineup participants, no unusual or highly noticeable discrepancies existed. Furthermore, as Judge McAuliffe observed, while the prosecutrix's knowledge that the man arrested at the bus station would be in the lineup may have placed some additional stress or compulsion on her to make an identification, it did not render the proceeding impermissibly suggestive.[27]

---

made prior to trial, it may be preliminarily determined by the court, or the ruling may be deferred for determination at the trial of the general issue. Md. Rule 725 d. Denial prior to trial of a motion to suppress identification evidence, however, does not preserve the objection to the evidence on appeal. "Further objection must be made to the introduction of the evidence at the trial on the general issue as required by Rule 522 d 2. Under the dictates of that rule objection must be made at the time such evidence is offered, or as soon thereafter as the objection to its admissibility shall have become apparent." Jones v. State, 9 Md. App. at 457, 265 A. 2d at 272; *quoted in* Townsend v. State, 11 Md. App. at 488, 275 A. 2d at 192. The transcript reveals that defense counsel in this case was careful about preserving the matter of admissibility for appeal. Appellant's objection was timely made under Rule 522. Moreover, the appellant also carefully preserved. in the record: the objections made at the preliminary hearing.

**27.** We think it likely that most victims called to view a lineup are under the impression that the culprit is probably a person in the lineup.

## V.

"Was the appellant wrongfully compelled to give voice exemplars in that he was ordered to speak the very words spoken by the assailant during the commission of the crimes alleged, and to so speak on two separate occasions?"

On motion by the State, and over the strenuous objections of the appellant, he was required to submit to the furnishing of voice exemplars. Furnishing voice exemplars is a relatively simple procedure. The subject merely speaks several words into an electronic device which graphically records the characteristics of his voice. *United States v. Askins*, 351 F. Supp. 408 (D. Md. 1972). Compelling submission of the exemplars, however, raises the question of possible violations of the Fourth and Fifth Amendments.

It has long been held that the compelled display of identifiable physical characteristics does not infringe upon interest protected by the privilege against compulsory self-incrimination. *Holt v. United States*, 218 U. S. 245, 31 S. Ct. 2, 54 L.Ed. 1021 (1910).

The Fifth Amendment protects only those communications and physiological reactions which are *testimonial* in nature. *Schmerber v. California*, 384 U. S. 757, 86 S. Ct. 1826, 16 L.Ed.2d 908 (1966). "[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Holt v. United States, supra*, 218 U. S. at 252-53, 31 S. Ct. at 6, 54 L. Ed. at 1030, *quoted in United States v. Dionisio*, 410 U. S. 1, 6, 93 S. Ct. 764, 767, 35 L.Ed.2d 67, 74 (1973).

In *United States v. Askins, supra*, the defendant advanced the theory that the act of speaking into a machine somehow differs from the act of speaking to witnesses which was held valid in *United States v. Wade*, 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967). The thrust of *Wade*, however, was not that the defendant was required to speak before live witnesses, but that he was ". . . required to use his voice as

an identifying physical characteristic, not to speak his guilt." *United States v. Wade, supra*, 388 U. S. at 222-23, 87 S. Ct. at 1930, 18 L.Ed.2d at 1155.

The Supreme Court stated in *Schmerber v. California*, *supra:*

> "[B]oth federal and state courts have usually held that . . . [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."[28] 384 U. S. at 764, 86 S. Ct. at 1832, 16 L.Ed.2d at 916.

*Wade* refutes the contention that the compelled production of voice exemplars violates the Fifth Amendment. The exemplars of appellant's voice were to be used solely to measure the physical properties of his voice, and not for the testimonial or communicative content of what was said. *See United States v. Dionisio, supra; United States v. Askins, supra.*

Article 22 of the Maryland Declaration of Rights is to be construed *in pari materia* with the self-incrimination provisions of the Fifth Amendment to the Federal Constitution. *State v. Panagoulis*, 253 Md. 699, 253 A. 2d 877

---

28. In Robinson v. State, *supra,* 18 Md. App. 678, 692, 308 A. 2d 734, 744 (1973), we commented that:

"It has been held that the taking of fingernail scrapings, urine samples, saliva, and clipping of hair are valid. *See Cupp v. Murphy*, 412 U. S. 291, 93 S. Ct. 2000, 36 L.Ed.2d 900 (1973); *Simms v. State*, 4 Md. App. 160, 242 A. 2d 185 (1968); *United States v. Cox*, 428 F. 2d 683 (7th Cir. 1970); *Novak v. District of Columbia*, 49 A. 2d 88 (Mun. Ct. App. D.C. 1946); *rev'd on other grounds*, 82 U.S. App. D.C. 95, 160 F. 2d 588 (1947). *See also* Cook, *Constitutional Rights of the Accused, Pretrial Rights* (1972), § 57."

(1969). Thus, since there has been no Fifth Amendment violation, it follows that there has been no violation of Article 22 of the Declaration of Rights.

The Fourth Amendment guarantees that all people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." Any Fourth Amendment violation in the present setting must rest on a lawless governmental intrusion upon the privacy of the person rather than on unlawful interference with "property relationships or private papers." *Schmerber v. California*, 384 U. S. at 767, 86 S. Ct. at 1834, 16 L.Ed.2d at 918.

When a defendant's person is the source of the desired evidence, there is a two-prong test of reasonableness: *First*, the procedure used to obtain the evidence must neither shock the conscience nor offend society's traditional sense of justice. *Rochin v. California*, 342 U. S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952). The Fourth Amendment offers no protection for that which "a person knowingly exposes to the public, even in his own home or office. . . ." *Katz v. United States*, 389 U. S. 347, 351, 88 S. Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967). The physical attributes of a person's voice, just like his facial features, or his handwriting, are constantly exposed to the public. *United States v. Dionisio*, 410 U. S. at 14, 93 S. Ct. at 771, 35 L.Ed.2d at 79. Chief Judge Friendly, writing for the United States Court of Appeals, Second Circuit, in *United States v. Doe*, 457 F. 2d 895, 898-99 (1972) opined:

> "Except for the rare recluse who chooses to live his life in complete solitude, in our daily lives we constantly speak and write, and while the content of a communication is entitled to Fourth Amendment protection . . . the underlying identifying characteristics — the constant factor throughout both public and private communications — are open for all to see or hear. . . . Hence no intrusion into an individual's privacy results from compelled execution of handwriting

or voice exemplars; nothing is being exposed ... that has not previously been exposed to the public at large."

*Second,* the police had probable cause in requesting the exemplar following applicant's arrest at the bus station and his identification at the lineup.

Appellant relies upon *Lucas v. State,* 271 S.W.2d 821 (Tex. Crim. 1954); *State v. Taylor,* 213 S. C. 330, 49 S.E.2d 289 (1948); and *Beachem v. State,* 162 S.W.2d 706 (Tex. Crim. 1942) to support his contention that compelling the production of voice exemplars violates his constitutional rights. All three of those cases held that requiring a person to speak certain words was a violation of the Fifth Amendment right against compulsory self-incrimination. The Supreme Court, in *Schmerber* and *Wade,* as the final arbiter of Federal Constitutional rights, decided otherwise. In any event, *Lucas* and *Taylor* grounded their holdings on *Beachem* which was expressly overruled in *Olson v. State,* 484 S.W.2d 756, 771 (Tex. Crim. 1969). We think that to the extent *Lucas* and *Taylor* depend on *Beachem* their vitality has been vitiated, and, additionally, since the *Taylor* decision, South Carolina has recognized *Wade* and upheld the introduction of voice tapes. *State v. Vice,* 259 S. C. 30, 190 S.E.2d 510 (1972).

We are persuaded that voice exemplars, taken, as here, under proper order of court, based upon probable cause, do not infringe upon an accused's Fourth or Fifth Amendment rights nor upon his Maryland Constitutional rights. We hold that the court order for the appellant to submit to the voice exemplars was proper.

## VI.

"Did the trial court err in admitting into evidence a telephone call made by the appellant to the complainant two days prior to his scheduled trial at a time when he was under indictment and his counsel was not present?"

On December 6, 1975, appellant said that he entered his cell and found a note on his bed, placed there apparently by a guard, Officer Hutchinson, concerning a telephone call. Under prescribed procedures, guards are supposed to give phone messages directly to the inmates. A different guard, Officer Capasso, accompanied the appellant to a telephone, and the guard dialed the number furnished to him by the appellant. Officer Capasso testified that the appellant said something about, "something a couple years ago" and then became very nervous and hung up the telephone. The conversation lasted about 30 seconds. Officer Capasso did not follow the rules and regulations of the detention center in allowing appellant to make the call and did not make a notation about it until he was asked to do so by a representative of the State.

Appellant contends that he thought he was calling a Miss Cynthia Armor at the Visitor's Service Center, about an emergency pertaining to his detainer. The party at the other end of the line, however, proved to be, in fact, the complaining witness in the instant case. Appellant asserts that everyone in the detention center knew that a positive identification was imperative in his case to secure a conviction. Officer Capasso testified that the Maryland telephone directory is available to the inmates.

At trial appellant orally presented a motion *in limine* to prohibit the State from using the evidence of the call to the victim. The trial court conducted a hearing and denied the motion.

In denying appellant's motion *in limine*, the trial judge found as a fact that the call was made on the initiative of the appellant and not as a result of any State action. Appellant argues that, notwithstanding the trial court's determination, *Blizzard v. State*, 30 Md. App. 156, 351 A. 2d 443 (1976) prohibits the use of any post-indictment statement elicited by the State, pertaining to the subject matter for which the accused has been indicted, absent an effective waiver of the right to the presence of counsel. *Blizzard v. State, supra,* was, however, reversed by the Court of Appeals in *State v. Blizzard*, 278 Md. 556, 366 A. 2d 1026 (1976), so that

appellant's reliance on this Court's *Blizzard* has been blown away.[29]

The Court of Appeals pointed out that, " 'The rule [of *Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964)] does not apply to spontaneous or voluntary statements made by the defendant in the presence of government agents.' " *State v. Blizzard,* 278 Md. at 568, 366 A. 2d at 1032-33. *See also, Moore v. Wolff,* 495 F. 2d 35 (8th Cir. 1974); *United States v. Tucker,* 435 F. 2d 1017 (9th Cir. 1970); *United States v. Garcia,* 377 F. 2d 321 (2d Cir.), *cert. denied,* 389 U. S. 991, 88 S. Ct. 489, 19 L.Ed.2d 484 (1967). *Contra, e.g., United States v. Thomas,* 474 F. 2d 110 (10th Cir.), *cert. denied,* 412 U. S. 932, 93 S. Ct. 2758, 37 L.Ed.2d 160 (1973).

Just as the Court of Appeals found in *Blizzard,* there is no indication in the case now before us that trickery or cajolery was employed by the law enforcement agents.[30] The trial judge noted this was not a setup by the State agents, but, rather, the impetus to make the call was entirely appellant's independent thought and action. There was no interrogation and nothing was elicited by the authorities. Without a showing of surreptitious behavior on the part of the State, the exclusionary rule of *Massiah* does not apply. *State v. Blizzard, supra.* There was no error in admitting into evidence that the appellant telephoned the prosecutrix from the County Detention Center.

*Judgments affirmed.*
*Costs to be paid by appellant.*

---

**29.** *But see,* Brewer v. Williams, 430 U. S. 387, 20 Cr. L. 3095, decided March 23, 1977.

**30.** This Court reached a different determination. *See* Blizzard v. State, *supra.*